IN RE the COMMITMENT OF Charles W. MARK:

STATE of Wisconsin, Petitioner-Respondent,

v.

Charles W. MARK, Respondent-Appellant.

Court of Appeals

*No. 2007AP522. Oral argument November 20, 2007. —Decided January 31, 2008.*

2008 WI App 44

(Also reported in 747 N.W.2d 727.)

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Glenn L. Cushing, assistant state public defender*, Madison. There was oral argument by *Glenn L. Cushing*.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Warren D. Weinstein, assistant attorney general*, and *J.B. Van Hollen, attorney general*. There was oral argument by *Warren D. Weinstein*.

Before Higginbotham, P.J., Vergeront and Lundsten, JJ.

¶ 1. VERGERONT, J. This appeal concerns the use at a trial under WIS. STAT. ch. 980 of a written and an oral statement made by the respondent, Charles W. Mark, to his parole officer. In *State v. Mark*, 2006 WI 78, ¶ 34, 292 Wis. 2d 1, 718 N.W.2d 90, on Mark's first appeal concerning the use of these statements at trial, the supreme court remanded to the circuit court for a determination whether the two statements were compelled. On remand, the circuit court determined that the written statement was compelled but nonetheless admissible in spite of the Fifth Amendment privilege[1] against self-incrimination because the statement was

---

[1] The Fifth Amendment to the Unites States Constitution provides, in pertinent part, "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. This applies to the states through the Fourteenth Amendment, which provides: "No State shall make or

rendered non-incriminating by the grant of immunity on the preprinted form. As to the oral statement, the court concluded that it, too, was compelled and, because there was not a grant of immunity for this statement, it was incriminating and should have been excluded under the Fifth Amendment. However, the court concluded, its admission was harmless error.

¶ 2. Mark's primary contention on appeal is that both the written and oral statements were compelled and their use at trial, as well as any derivative use, violated his Fifth Amendment privilege against self-incrimination. These errors, he asserts, were not harmless.

¶ 3. We conclude that Mark's written and oral statements were compelled and, because they were also testimonial and incriminating, their admission at trial violated Mark's Fifth Amendment privilege against self-incrimination, made applicable to him by WIS. STAT. § 980.05(1m).[2] We further conclude that, under Fifth Amendment case law, testimony referring to the hotel incident described in the statements and the two experts' opinions that Mark was much more likely than not to reoffend should have been excluded because that evidence was derived from the two statements. Finally, we conclude these errors were not harmless. We therefore reverse the circuit court's order on remand, reverse the judgment that Mark is a sexually violent person, and remand for a new trial.

enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV, § 1. *See State v. Mark*, 2006 WI 78, ¶ 2, 292 Wis. 2d 1, 718 N.W.2d 90.

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

## BACKGROUND

¶ 4. Mark was convicted in 1994 on three counts of first-degree sexual assault of a child based on his guilty pleas. He was sentenced to eight years of confinement, followed by two fifteen-year terms of probation, to be served consecutively to the confinement but concurrently to one another. Mark was released on parole in May 1999, but his parole was revoked in June 2000 because of an incident involving a woman in the residential hotel where Mark lived. Mark was sent back to prison to serve the rest of his confinement. In June 2002, just before his scheduled release, the State filed a petition alleging that Mark was a sexually violent person under WIS. STAT. § 980.01(7).[3]

¶ 5. At the WIS. STAT. ch. 980 trial, the State offered into evidence and the circuit court admitted a written statement and an oral statement made by Mark

---

[3] WISCONSIN STAT. § 980.01(7) provides:

(7) "Sexually violent person" means a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of or not responsible for a sexually violent offense by reason of insanity or mental disease, defect or illness, and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence.

The term "substantially probable" was construed in *State v. Curiel*, 227 Wis. 2d 389, 406, 597 N.W.2d 697 (1999), to mean "much more likely than not." We use this latter phrase throughout the opinion. We use the term "reoffend" as shorthand for "engage in acts of sexual violence."

This statute was amended by 2003 Wis. Act 187, § 2, enacted April 7, 2004, and now provides that the mental disorder must "make[] it likely that the person will engage in one or more acts of sexual violence." WIS. STAT. § 980.01(7) (2005–06).

to his parole agent concerning the hotel incident.[4] The written statement, signed by Mark, was on a form at the top of which was printed:

> PROBATION/PAROLE/OFFENDER I have been advised that I must account in a truthful and accurate manner for my whereabouts and activities, and that failure to do so is a violation for which I could be revoked. I have also been advised that none of this information can be used against me in criminal proceedings . . . .

¶ 6. In this written statement, Mark described the hotel incident as entering the room of a woman who lived next to him at his residential hotel and, upon finding her in the bathroom, trying to forcibly gain entrance to the bathroom while she yelled for him to get out. This written statement claims that Mark wanted only to see her naked and he reported the incident to his parole agent because the woman threatened to call the police.

¶ 7. Mark's oral statement was recorded on the parole agent's log about two weeks after the written statement. In this statement Mark admitted that his motivation for wanting to break into the bathroom was to have sex with the woman.

¶ 8. These two statements were introduced at trial through Mark's current probation agent[5] and the

---

[4] There were two other statements by Mark, one written and one oral, concerning two other incidents that were the subject of Mark's first appeal in *Mark*, 292 Wis. 2d 1, ¶¶ 4, 7. However, the supreme court determined neither could subject Mark to future prosecution and they were not the subject of the remand to the circuit court. *Id.*, ¶¶ 31–32. This other written statement concerned a woman from Mark's church and we discuss it later in the opinion. *See infra* ¶¶ 56, 57.

[5] At the time of the Wis. Stat. ch. 980 trial, Mark was beginning to serve the concurrent fifteen-year terms of probation.

agent read them. The State also presented two expert witnesses[6] who opined that Mark had pedophilia, meaning that he is sexually attracted to prepubescent children, and as a result it was much more likely than not that he would reoffend. Both of these experts considered the hotel incident in arriving at their opinions on Mark's future dangerousness. The defense expert presented her opinion that the actuarial instruments are inadequate to predict future behavior. She did not perform an evaluation on Mark and did not offer an opinion on his future dangerousness.

¶ 9. The jury found that Mark was a sexually violent person under WIS. STAT. § 980.01(7) and the court entered a judgment and commitment order based on the verdict. Mark appealed to this court. He contended, among other issues, that the statements used against him were compelled and, because under WIS. STAT. § 980.05(1m) he was entitled at his trial to "[a]ll constitutional rights available to a defendant in a criminal proceeding,"[7] the admission of his statements violated his Fifth Amendment privilege against self-incrimination. We concluded that these statements were incriminating and we remanded to the circuit court to determine if the statements were compelled,

---

[6] One of the two was appointed by the court but called by the State.

[7] WISCONSIN STAT. § 980.05(1m) provides:

> **(1m)** At the trial to determine whether the person who is the subject of a petition under s. 980.02 is a sexually violent person, all rules of evidence in criminal actions apply. All constitutional rights available to a defendant in a criminal proceeding are available to the person.

This statute was repealed by 2005 Wis. Act 434, § 101, enacted May 22, 2006, but the repeal does not affect this appeal.

and, if so, whether their admission was harmless. *State v. Mark*, 2005 WI App 62, ¶ 2, 280 Wis. 2d 436, 701 N.W.2d 598.

¶ 10. The supreme court affirmed our decision and remanded for further proceedings in the circuit court. *Mark*, 292 Wis. 2d 1, ¶ 2. The supreme court held that WIS. STAT. § 980.05(1m) grants a WIS. STAT. ch. 980 respondent the same rights at the commitment trial as a defendant in a criminal case and, therefore, a respondent's statement is properly excluded under the Fifth Amendment privilege against self-incrimination if it is testimonial, compelled, and incriminating. *Id.* Both parties conceded Mark's written statement and oral statement about the hotel incident were testimonial. *Id.*, ¶ 28 n.10. The supreme court agreed with this court that both statements were incriminating because they could subject Mark to future criminal prosecution, at a minimum disorderly conduct. *Id.*, ¶ 33. The supreme court remanded to the circuit court for a determination whether the statements were compelled. *Id.*, ¶ 34. If the circuit court determined that either or both statements were compelled and thus should have been excluded under the Fifth Amendment, the court was to engage in a harmless error analysis.[8] *Id.*

¶ 11. On remand the circuit court held an evidentiary hearing at which the only witness was Mark's parole agent at the time the statements were made. The court found that the agent had no independent recol-

---

[8] Mark also argued before this court and the supreme court that the admission of these statements at trial violated his due process right not to have his involuntary statements admitted. The supreme court agreed with this court that, with respect to the use of a defendant's involuntary statement in a criminal trial, the rights conferred by the due process clause and the Fifth Amendment were co-extensive. *Mark*, 292 Wis. 2d 1, ¶ 34 n.13.

lection of meeting with Mark on the date on which either statement was made. The court found it was the parole officer's practice to explain the warning on the top of the written statement and that the box next to the warning was marked to show compliance with this requirement; if the person was unwilling to make a statement, she would remind the person of the obligation to make a statement and the possible penalty of revocation for failing to do so. The court further found that Mark was in custody under the agent's authority in the Jefferson County Jail at the time both statements were made to the agent. Based on these findings, the court determined that, although the written statement was compelled, it was nonetheless admissible because it was rendered non-incriminating by the grant of immunity on the preprinted form. The oral statement was also compelled, the court concluded, but there was no grant of immunity and therefore it was incriminating and should have been excluded. However the court decided that its admission was harmless error.

## DISCUSSION

¶ 12. On appeal, Mark contends the circuit court erred in concluding that the written statement was admissible because of the grant of immunity and, thus, admission of both statements violated his Fifth Amendment privilege against self-incrimination. Mark asserts that, because he is entitled under Wis. Stat. § 980.05(1m) to the same rights at trial that a criminal defendant has, any use or derivative use of his compelled statements was error under *Kastigar v. United States*, 406 U.S. 441 (1972), and *New Jersey v. Portash*, 440 U.S. 450 (1979), and the error was not harmless.[9]

---

[9] Mark makes two additional arguments that we do not resolve. First, he argues that this court, *State v. Mark*, 2005 WI

¶ 13. The State agrees with Mark that the circuit court erred in concluding that the written statement was admissible, but, it contends, the court erred in determining that the oral statement was compelled. In the State's view only the written statement itself should have been excluded; it does not agree with Mark that he is entitled to the protection of *Kastigar* and *Portash*—that is, that no derivative use may be made of the compelled written statement. According to the State, admission of the written statement was harmless error.[10]

¶ 14. We discuss the issues in this order: (1) Was the written statement erroneously admitted? (2) Was the oral statement erroneously admitted? (3) Do *Kastigar* and *Portash* define the scope of protection Mark is entitled to at trial regarding the use and derivative use of any compelled statement? (4) Are the error or errors we identify harmless?

---

App 62, ¶ 20, 280 Wis. 2d 436, 701 N.W.2d 598, and the supreme court, *Mark*, 292 Wis. 2d 1, ¶ 30, erred in rejecting his position that "incriminating" should be defined as "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial[,]" citing *Rhode Island v. Innis*, 446 U.S. 291, 302 n.5 (1980). (Emphasis in original.) However, as Mark recognizes, we are bound by the supreme court's decision and by our prior decision. *Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997).

Second, Mark argues that we should construe the due process clause of article I, section 1 of the Wisconsin Constitution to grant WIS. STAT. ch. 980 respondents the right to exclude at trial involuntary or compelled statements. The supreme court declined to address this issue because Mark did not raise it before the circuit court or before our court. *Mark*, 292 Wis. 2d 1, ¶ 34 n.13. We decline to address it now.

[10] In summarizing the parties' arguments, we synthesize the arguments in their briefs and those made at oral argument.

¶ 15. The construction of WIS. STAT. § 980.05(1m) in light of *Mark* and the application of constitutional standards to established facts present questions of law, which we review de novo, *see Mark*, 292 Wis. 2d 1, ¶ 12, as does the determination whether an error is harmless. *State v. Carnemolla*, 229 Wis. 2d 648, 653, 600 N.W.2d 236 (Ct. App. 1999). To the extent the circuit court made findings of fact, we accept those unless clearly erroneous. *State v. Jensen*, 2007 WI 26, ¶ 12, 299 Wis. 2d 267, 727 N.W.2d 518.

I. Written Statement

¶ 16. Although the State concedes the court erred in concluding the written statement was admissible because of the grant of immunity, we discuss this point because it provides important context for the discussion of other issues. The circuit court concluded that the written statement was compelled but was nonetheless rendered non-incriminating under *State v. Evans*, 77 Wis. 2d 225, 252 N.W.2d 664 (1977). In *Evans*, the court held that statements or fruits of statements made by a probationer to his probation agent or in a revocation hearing in response to questions that are the result of pending charges or accusations of criminal activities could not, under the Fifth Amendment, be used to incriminate the probationer in a subsequent criminal proceeding; however, the State could compel a probationer's statement if he or she is protected by a grant of immunity that renders the compelled statement inadmissible against the witness in a criminal prosecution. *Id.* at 227–28, 235.

¶ 17. The State concedes that the written statement was compelled and agrees with Mark, that, because WIS. STAT. § 980.05(1m) gives Mark the same right a

defendant would have at a criminal trial, his compelled written statement may not be used against him at the WIS. STAT. ch. 980 trial. We accept this as a correct statement of law. Indeed, it appears to us required by *Mark*. If the supreme court views the statement of immunity, which was plainly contained on the written statement, as making the statement admissible at Mark's ch. 980 trial, it would not have reversed and remanded for a determination whether the statement was compelled and, if it was, whether admission of the statement was harmless error.[11] *See Mark*, 292 Wis. 2d 1, ¶ 34.

¶ 18. Because the written statement was testimonial, incriminating, and compelled, its admission at Mark's trial was error, as both parties recognize.

[11] We recognize that footnote 12 in *Mark*, referring to Justice Roggensack's concurrence, may have led the circuit court to consider the grant of immunity on the written statement as a ground for concluding the written statement was not incriminating. 292 Wis. 2d 1, ¶ 33 n.12. The concurrence concluded there was no reason to remand with respect to the written statement because it was not incriminating since it could not be used against Mark at a criminal trial. *Id.*, ¶ 43 (Roggensack, J., concurring). We are uncertain what the supreme court meant to convey in footnote 12, but we are persuaded that it should not be read to be inconsistent with the conclusions the court comes to in the body of its opinion: that the statement was incriminating because it could subject Mark to future criminal prosecution and (there being no issue on whether it was testimonial) that the court was remanding for a determination whether the statement was compelled and, if it was, whether its admission was harmless. *Id.*, ¶¶ 33–34. We understand Justice Roggensack's concurrence to be adopting a different definition of incriminating than that employed in the majority opinion.

II. Oral Statement

¶ 19. The circuit court concluded that the State did not meet its burden of showing that Mark's oral statement was not compelled. The agent recorded the oral statement in her log on May 11, 2000, when she served the notice of violations in support of revocation on him in the Jefferson County Jail. In reaching its conclusion, the court considered it significant that Mark was in custody under the agent's authority beginning on April 25, 2000, and remained in custody under that authority on the date of the written statement and the date of the oral statement, thirteen days later; that the written statement was accompanied by a clear warning of the penalty for failure to provide a statement to an agent; and that the oral statement related to the same incident as the written statement.

¶ 20. When an individual has given an involuntary statement, a subsequent statement is also considered involuntary unless it can be "separated from the circumstances surrounding" the earlier statement by a "break in the stream of events," between the first statement to the second, "sufficient to insulate the statement from the effect of all that went before." *Clewis v. Texas*, 386 U.S. 707, 710 (1967); *see also Darwin v. Connecticut*, 391 U.S. 346, 349 (1968); *Beecher v. Alabama*, 389 U.S. 35, 38 (1967). The rationale for the rule was explained in *United States v. Bayer*, 331 U.S. 532, 540–41 (1947):

> Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back into the bag. The secret is out for

> good. In such a sense, a later confession may always be looked upon as the fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.

The Court in *Bayer* concluded that the second confession was admissible because it was made six months after the first one and the defendant was no longer confined in adverse circumstances in the psychopathic ward of a military hospital; the only restraint he was under at the time of the second confession was that he could not leave the military base without permission. *Id.* at 541.

¶ 21. The State agrees with Mark that, in applying the principle of these cases, when the State seeks to use a statement made subsequent to an involuntary statement, it has the burden of demonstrating that the second statement is free from the coercive circumstances surrounding the first statement and was not directly produced by the existence of the earlier statement.[12] *See Darwin*, 391 U.S. at 351 (Harlan, J., concurring in part and dissenting in part) (citing *Bayer*, 331 U.S. at 540–41).

---

[12] After setting out the law as established in *United States v. Bayer*, 331 U.S. 532, 540–41 (1947), *Clewis v. Texas*, 386 U.S. 707, 710 (1967), *Beecher v. Alabama*, 389 U.S. 35, 38 (1967), and *Darwin v. Connecticut*, 391 U.S. 346, 349 (1968), the State asserts that it is "questionable" whether the legislature "meant to engraft this *Bayer* analysis for confessions when it adopted Wis. Stat. § 980.05(1m)" and "questionable" whether "the analysis even applies to a statement obtained through a grant of immunity . . . ." However, the State does not develop an argument to support these assertions, but instead argues that, even under the *Bayer* analysis, Mark's oral argument is inadmissible. Because the State does not explain why the framework for

¶ 22. Factors that may be relevant in deciding whether there is a sufficient break in the stream of events from the first statement to the second include: the change in place of the interrogations, the time that passed between the statements, and the change in the identity of the interrogators. 3 WILLIAM E. RINGEL, SEARCHES & SEIZURES, ARRESTS AND CONFESSIONS § 25.12 (2d ed. 2007) (citing *United States v. Marenghi*, 109 F.3d 28, 33 (1st Cir. 1997); *see also United States v. Lopez*, 437 F.3d 1059, 1066–67 (10th Cir. 2006)). Additionally, the extent to which the coercion employed in obtaining the initial confession was severe enough to be likely to affect the defendant's subsequent statements is to be considered. *Id.* (citing *Lyons v. Oklahoma*, 322 U.S. 596 (1944)).

¶ 23. The State argued in its brief that the court found the oral statement was voluntary and this finding is supported by the evidence that the agent went to the jail to serve him with the notice of violation, by the lack of evidence that she prompted his oral statement with any questions, and by her testimony that, although she could not remember the meeting, it would have been unusual for her to have gone over the violation with him again. Mark's reply brief pointed out that the State had misread the court's decision. We agree with Mark. While the court did state that the oral statement "was volunteered by Mark and was not made pursuant to any directive from [the probation agent] to provide more information," it went on to conclude, for the reasons we have mentioned in paragraph 19, that the State had not met its burden to prove the statement was not compelled and therefore the statement was compelled. To

analysis advanced by Mark is inapplicable and employs that framework in its own arguments, we accept the *Bayer/Clewis/ Beecher/Darwin* line of cases as applicable here.

the extent the State is arguing that the evidence shows that no *additional* compulsion was placed upon Mark at the time of his oral statement, that argument does not address the critical inquiry: what evidence shows that the compulsion that produced the written statement was removed?

¶ 24. The State also points to the notation in the log directly following the statement "now admits motivation to break into bathroom of [the woman] was to have sex." That notation is: "offered this additional information to agent. Wants SOT-oriented residential xx upon parole. Thinks that if a judge orders this he'll be able to get it in another county since Jefferson Co. does *not* have such a facility . . . ." (Emphasis in original.) The State asserts that this shows Mark had a motive "quite apart from any obligation to answer questions truthfully for offering the additional information"—that is, he wanted to be sent to a specific institution. However, this argument was not made in the circuit court and the court made no factual finding that Mark had offered the statement for this purpose. It is by no means clear from this notation what Mark's motive was in telling the agent, and the agent could remember nothing to add to the notation. Inferring Mark's motivation from the notation alone involves significant speculation. But even if the inference the State asks us to draw from the notation is reasonable, it is inconsistent with the circuit court's conclusion that the oral statement was compelled. We assume the circuit court implicitly makes those findings necessary to support its decision, and we accept those implicit findings if they are supported by the record. *Town of Avon v. Oliver*, 2002 WI App 97, ¶ 23, 253 Wis. 2d 647, 644 N.W.2d 260. It is implicit in the court's decision here that Mark made the oral statement for the same

reasons he made the written statement—the warning on the written statement of the consequences of failing to truthfully report his conduct. We do not look for evidence or inferences from the evidence that support a conclusion contrary to that reached by the circuit court.

¶ 25. We conclude the circuit court correctly decided the State did not meet its burden of showing that the oral statement was not compelled. Thirteen days earlier he had given the written statement on a form that warned him that he had to "account in a truthful and accurate manner for my whereabouts and activities, and that failure to do so is a violation for which I could be revoked," and the court accepted the agent's testimony that, although she could not remember this meeting with Mark, she would have explained this warning to him. When he gave the oral statement, it was to the same agent, he was still in jail under the agent's authority, and he had been served with notice there were going to be revocation proceedings. The circumstances of his restraint had not changed and there is no basis for inferring that he did not think he was any longer obligated to give a true and accurate account in order to avoid a revocation on that ground. The State's proffer of an independent motivation is based on a weak inference from the evidence that the circuit court was not asked to consider and that is insufficient to meet its burden. Accordingly, we conclude the oral statement, like the written statement, was compelled.

III. Erroneously Admitted Evidence

¶ 26. The parties agree that, if both the written and oral statements were compelled, then admission of the statements violated Mark's Fifth Amendment privi-

lege against self-incrimination that applies to him at a WIS. STAT. ch. 980 trial by virtue of WIS. STAT. § 980.05(1m). We also understand them to agree that, in that event, the error was not only the admission and reading of the statements themselves, but references to the hotel incident. However, the parties disagree whether the opinions of the experts—Dr. Debra Anderson and Dr. Patricia Coffey—who used those statements are also inadmissible. Mark contends they are. He asserts that, under *Kastigar* and *Portash*, the scope of the Fifth Amendment protection at trial is not limited to exclusion of the compelled statements but also precludes the State from presenting evidence that is the result of use or derivative use of the statements. According to Mark, it is clear that the two experts used and relied on Mark's two statements about the hotel incident in arriving at their opinions.

¶ 27. The State at oral argument agreed that the experts' use of the compelled statements in arriving at their opinions and scoring the actuarial instruments was a derivative use of the compelled statements. However, the State argues that we should decide that exclusion of evidence derived from a compelled statement is not required at a WIS. STAT. ch. 980 trial. We understand the State to be making two alternative arguments: first, Fifth Amendment case law does not require the exclusion of the experts' opinions based on the compelled statements, and, second, even if the case law does, WIS. STAT. § 980.05(1m) does not require that we apply that case law.[13]

---

[13] Substantially the same issue and some of the same arguments are presented in *State v. Harrell*, 2008 WI App 37, 308 Wis. 2d 167, 747 N.W.2d 770. We scheduled oral argument

¶ 28. In *Kastigar*, the court held that a federal statute that provided immunity from use and derivative use of compelled statements was commensurate with protection afforded by the Fifth Amendment privilege against self-incrimination and therefore sufficed to supplant it. 406 U.S. at 459, 461. In clarifying the scope of the Fifth Amendment privilege, the Court stated:

> Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords th[e] protection [of the Fifth Amendment privilege]. It prohibits the prosecutorial authorities from using the compelled testimony in any respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness.

*Id.* at 453. The Court stated that, once a defendant demonstrates that he or she has testified under a grant of immunity for matters related to the prosecution, the government has the burden of showing "that [its] evidence is not tainted by establishing that [it] had an independent, legitimate source for the disputed evidence." *Id.* at 460 (citations omitted). "This burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.*

¶ 29. In *Portash*, 440 U.S. 450, the Court again discussed the scope of the protection of the Fifth Amendment privilege. In rejecting the argument that a person's testimony before a grand jury under a grant of immunity could be used for impeachment purposes at a later trial, the Court stated that "[t]estimony given in

in both cases on the same day and we are releasing both opinions on the same day. Much of our discussion in this section closely tracks that in *Harrell*.

response to a grant of legislative immunity is the essence of coerced testimony[,]" the Fifth Amendment provides protection against compelled self-incrimination whether or not it is reliable, and that "*any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process . . . ." *Id.* at 459 (citation omitted, emphasis in original).

¶ 30. Where the issue is whether a witness's testimony was directly or indirectly derived from a defendant's immunized statement, the inquiry is what the witness knew prior to the exposure to the immunized testimony and what information was gleaned from the exposure. *See United States v. North*, 920 F.2d 940, 944 (D.C. Cir. 1990). The State might meet this burden, for example, by demonstrating through testimony that a witness exposed to the immunized testimony had set down his or her "story" before exposure. *See id.*

¶ 31. The State at oral argument acknowledged that *Kastigar* and *Portash* might be read to support Mark's theory that the Fifth Amendment precludes admission of evidence derived from his compelled statements; but it asserts that a later case, *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), supports its position to the contrary. The State relies on this statement from *Verdugo-Urquidez*: "The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental *trial right* of criminal defendants. Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs *only at trial.*" *Id.* at 264 (citation omitted, emphasis added). The State's position is that, because the experts formed their opinions before trial, their use or derivative use of Mark's compelled statements occurred then, not at trial, and thus do not

constitute a Fifth Amendment violation at Mark's trial.[14]

¶ 32. We do not find this argument persuasive. *Verdugo-Urquidez* addressed a Fourth Amendment issue—whether that amendment applied to a search and seizure conducted in another country by United States agents of property owned by a non-resident alien. *See* 494 U.S. at 261. The Court concluded the Fourth Amendment did not apply. *Id.* The statement on which the State relies came early in the case, the Court expressly said the Fifth Amendment was not in issue, and the context makes clear that the point the Court intended to make was that a Fourth Amendment violation, unlike a Fifth Amendment violation, occurs when the allegedly unreasonable government intrusion occurs whether or not there is ever an attempt to present the evidence at a criminal trial. *Id.* at 264.[15]

---

[14] The State made this argument before the supreme court on Mark's prior appeal and the supreme court found it unnecessary to address it. The court explained that it was "satisfied that under the circumstances presented in this case, the correct framework for analysis is one that determines whether the statements were testimonial, compelled, and incriminating." *Mark*, 292 Wis. 2d 1, ¶ 13 n.4. We do not read this comment to preclude us from addressing the argument at this stage in the proceedings, given the focus now on what evidence, besides the compelled statements, should have been excluded. The identification of the precise evidence that should have been excluded is, as both parties recognize, a necessary predicate to employing a harmless error analysis.

[15] The entire paragraph reads:

Before analyzing the scope of the Fourth Amendment, we think it significant to note that it operates in a different manner than the Fifth Amendment, which is not at issue in this case. The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants. Although conduct by law enforcement officials prior to trial may ultimately impair

¶ 33. The later case of *Chavez v. Martinez*, 538 U.S. 760 (2003), illustrates the characteristic of the Fifth Amendment that the *Verdugo-Urquidez* Court was contrasting with the Fourth Amendment. In *Chavez*, the majority held, in the context of a section 1983 action, that a violation of the Fifth Amendment privilege did not occur where a law enforcement officer compelled the plaintiff's statement but no charges were brought, although there might be a substantive due process violation.[16] *Id.* at 769–70, 773.

¶ 34. In this case, however, there was a trial, the supreme court has held that Mark is entitled to the rights at the trial that a criminal defendant would have, and the issue is the scope of protection a criminal

---

that right, a constitutional violation occurs only at trial. The Fourth Amendment functions differently. It prohibits "unreasonable searches and seizures" whether or not the evidence is sought to be used in a criminal trial, and a violation of the Amendment is "fully accomplished" at the time of an unreasonable governmental intrusion. For purposes of this case, therefore, if there were a constitutional violation, it occurred solely in Mexico. Whether evidence obtained from respondent's Mexican residences should be excluded at trial in the United States is a remedial question separate from the existence *vel non* of the constitutional violation.

*United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) (citations omitted).

[16] Justice Thomas wrote the lead opinion on the Fifth Amendment issue, citing *Verdugo-Urquidez*, and was joined by Chief Justice Rehnquist and Justices O'Connor and Scalia. *Chavez v. Martinez*, 538 U.S. 760, 763 (2003) (Thomas, J., in a plurality opinion joined by Rehnquist, C.J., O'Connor, J., and Scalia, J.). Justices Souter and Breyer concurred. *See id.* at 777–79 (Souter, J., delivering the opinion of the court and concurring in part). Justices Stevens, Ginsburg, and Kennedy dissented stating that a Fifth Amendment violation could occur in a non-trial setting, where one's statement might incriminate them in a future criminal proceeding. *Id.* at 791 (Kennedy, J., concurring in part and dissenting in part).

defendant would have at a trial under the Fifth Amendment with respect to the use of compelled statements. *Verdugo-Urquidez* does not purport to address the issue. We are satisfied that *Verdugo-Urquidez* does not modify in any way the scope of the Fifth Amendment protection articulated in *Kastigar* and *Portash*.

¶ 35. The State also relies on *State v. Watson*, 227 Wis. 2d 167, 595 N.W.2d 403 (1999), to argue that, because expert opinions are admissible at trial even if they are based on inadmissible evidence, the experts' use here of Mark's compelled statements to form their opinions is not a use that occurs at trial and, therefore, is not within the scope of Wis. Stat. § 980.05(1m). *Watson* addresses expert opinions in the context of Wis. Stat. § 907.03, which provides that an expert may rely on facts or data in forming an opinion that are not admissible in evidence if they are of a type reasonably relied on by experts in the field. *See* 227 Wis. 2d at 191. In *Watson*, the supreme court clarified that § 907.03 is not a hearsay exception and hearsay data on which an expert relies are not admissible for the truth of the matter unless they are admissible under a recognizable exception to the hearsay rule. *Id.* at 198–99. It concluded, therefore, that if an expert's opinion were based solely on inadmissible hearsay, a circuit court could properly decide that the opinion did not establish probable cause under Wis. Stat. ch. 980. *Id.* at 203. However, in the case before it, the supreme court decided that some of the experts' opinions were not based on inadmissible hearsay and those opinions together with the evidence of the respondent's pattern of prior offenses established probable cause. *Id.* at 211.

¶ 36. We do not agree that *Watson* supports the State's position. *Watson* does not support an argument that expert opinions are admissible even if they are

214

based on a compelled statement that is inadmissible under the Fifth Amendment. The inadmissibility in *Watson* was based on the evidentiary rules excluding hearsay; that case does not purport to, and could not, limit the scope of protection a person has under the Fifth Amendment.

¶ 37. We recognize that a difficulty for the parties —and this court—is that there appears to be no case law discussing use and derivative use of a compelled statement in a context similar to this case. This is not surprising. While in a Wis. Stat. ch. 980 proceeding the State typically presents psychiatric opinions on the respondent's mental health to prove its case, there are limited situations in criminal proceedings where that occurs. The use of expert opinions that may rely on a defendant's statements does occur when a defendant pleads not guilty by reasons of a mental disease or defect. However, generally, when a defendant initiates a psychiatric evaluation and places his or her mental status in controversy, he or she waives the right to remain silent. *State v. Slagoski*, 2001 WI App 112, ¶¶ 14–15, 244 Wis. 2d 49, 629 N.W.2d 50.

¶ 38. In addition, there is case law addressing when the State's introduction of a psychiatric opinion using a defendant's statement in the guilt or penalty phase of a criminal trial violates the defendant's Fifth Amendment privilege.[17] However, we have found no

---

[17] A leading case on this topic is *Estelle v. Smith*, 451 U.S. 454, 466–69 (1981), which holds that it is a violation of the Fifth Amendment for the State to introduce the testimony of a psychiatrist who evaluated the defendant for a competency hearing to prove future dangerousness at the penalty phase, where the defendant was not given *Miranda* warnings. (Use of the evaluation for the purposes of determining competency to

case that comes close to addressing the issue here, though two cases might be said to support Mark's position that an expert opinion relying on a compelled statement, as well as the compelled statement, must be excluded under the Fifth Amendment. In *Cape v. Francis*, 741 F.2d 1287, 1294 n.7 (11th Cir. 1984), the court concluded that a psychiatrist's testimony offered by the State at the guilt phase of the trial was a violation of the defendant's Fifth Amendment rights, noting that it was "of no import" that the psychiatrist did not testify directly to any specific statements made by the defendant; it was "enough that the psychiatrist based his expert opinion on the contents of responses by a defendant who had not been given proper warnings and had not had an opportunity to consult with counsel." The court then conducted a harmless error analysis and concluded the defendant would have been convicted without the psychiatrist's testimony. *Id.* at 1294–95.

¶ 39. Similarly, in *People v. Arcega*, 651 P.2d 338, 346–47 (Cal. 1982), the court concluded that the psychiatric testimony offered by the state at the guilt phase of the trial violated the Fifth Amendment because neither the statements of the defendant to a psychiatrist appointed for a competency evaluation nor the fruits of such statement may be used in a trial on guilt. The court then concluded that the admission of the psychiatrist's testimony was not harmless error. *Id.* at 349.

¶ 40. Although we have found no closely analogous Fifth Amendment case, we are convinced that the scope of the protection articulated in *Kastigar* and *Portash* extends to expert testimony at trial, including

stand trial did not implicate the Fifth Amendment because that did not assist the State in proving any element necessary to impose punishment. *See id.* at 465.)

216

opinions, that are based on a compelled statement. This is, in our view, the logical application of the protection against use and derivative use as applied to the facts of this case. We are not persuaded by the State's arguments that either *Verdugo-Urquidez* or *Watson* provide support for a different conclusion.

¶ 41. We are also not persuaded by the State's alternative argument—that the entire scope of Fifth Amendment protection need not be afforded Mark under WIS. STAT. § 980.05(1m). We understand *Mark* to hold that, by virtue of § 980.05(1m), at a WIS. STAT. ch. 980 trial the respondent has the same Fifth Amendment privilege against self-incrimination as does a defendant at a criminal trial, and the supreme court looked to Fifth Amendment case law to define the scope of the privilege. 292 Wis. 2d 1, ¶¶ 15–33. We do not see a basis in *Mark* for limiting the scope of the privilege as the State asks us to do.

¶ 42. An underlying concern of the State appears to be that, if it cannot use, even in a derivative way, an immunized statement of a respondent at a trial under WIS. STAT. ch. 980, then the usual way of proving its case will not be possible. We appreciate this concern and can see that, in those proceedings still governed by WIS. STAT. § 908.05(1m),[18] the ramifications of applying *Kastigar* and *Portash* are significant. However, we are persuaded that *Mark* requires that Mark is entitled at trial to the full protection of the Fifth Amendment privilege against self-incrimination. If there ought to be some modification of this principle to take into account the ch. 980 context, that modification must, in our view, be made by the supreme court.

[18] As noted earlier, WIS. STAT. § 908.05(1m) has been repealed.

¶ 43. As already noted, the State agreed at oral argument that the opinions of Dr. Anderson and Dr. Coffey, including their testimony on the actuarial instruments, were a derivative use of Mark's compelled statements. We understand the State to be referring to their opinions that it was much more likely than not that Mark would reoffend, not their opinions that he suffers from pedophilia. The experts each explain in their testimony why they arrived at this diagnosis, and it is based on Mark's offenses and attitudes with respect to children and adults who are childlike; they do not mention the hotel incident in this context:[19] However, it is clear from the testimony of both experts that they took the hotel incident into account in deciding that Mark was much more likely than not to reoffend. Both experts testified that they arrived at this opinion by considering his scores on the actuarial instruments, his overall behavior patterns, and his progress in treatment; on each of these points they took into account the hotel incident, considering it significant to their evaluations that the incident was sexually motivated. With respect to the actuarial instruments, both testified that,

---

[19] The reports of both experts were admitted in evidence at trial, but the trial exhibits are not part of the record, with the exception of exhibit 36, "Coding Rules For the Static-99." (Mark moved to supplement the motion with exhibit 36 and we granted the motion.) Thus, we have only the experts' testimony to consider in deciding what their opinions were based on. However, all Mark's arguments on the experts' use of his compelled statements are directed to their opinions that it is much more likely than not that he will reoffend, not on their opinions that he suffers from pedophilia. We therefore assume he is not contending that the opinions on pedophilia were based on his compelled statements.

without the hotel incident, Mark's score would have been lower, meaning he would have shown less of a risk without that. Dr. Coffey testified that his score might change by as much as three points on each of the two instruments she used if that conduct were not sexually motivated and Mark might not then be a candidate for WIS. STAT. ch. 980.

¶ 44. Accordingly, we conclude that the opinions of Dr. Anderson and Dr. Coffey that Mark was much more likely than not to reoffend should not have been admitted because they used his two compelled statements in arriving at those opinions. Thus, the erroneously admitted evidence consists of those opinions, as well as the compelled statements themselves, and any testimony referring to the statements or describing the hotel incident.

IV. Harmless Error Analysis

¶ 45. As the supreme court in *Mark* stated, errors in admitting evidence that should have been excluded under the Fifth Amendment are subject to the harmless error analysis. *Mark*, 292 Wis. 2d 1, ¶ 34 (citing *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991)). In keeping with this principle, courts that have applied *Kastigar* and concluded that evidence was erroneously admitted because the State did not meet its burden of showing no use or derivative use of an immunized statement have engaged in a harmless error analysis. *See United States v. Shelton*, 669 F.2d 446, 464 (7th Cir. 1982); *United States v. Ponds*, 454 F.3d 313, 328 (D.C. Cir. 2006).

¶ 46. The supreme court has stated that an error is harmless if the State—the beneficiary of the error—

219

proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Hale*, 2005 WI 7, ¶ 60, 277 Wis. 2d 593, 691 N.W.2d 637 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). The supreme court has also used the formulation that an error is harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *State v. Harvey*, 2002 WI 93, ¶ 49, 254 Wis. 2d 442, 647 N.W.2d 189 (citing *Neder v. United States*, 527 U.S. 1, 18 (1999)). These tests are equivalent in that an error does not contribute to the verdict if the court concludes that beyond a reasonable doubt a rational jury would have reached the same verdict without the error. *Id.*, ¶ 48 n.14. The factors that aid a court in determining whether an error is harmless include:

> [T]he frequency of the error, the importance of the erroneously admitted evidence, the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence, whether the erroneously admitted evidence duplicates untainted evidence, the nature of the defense, the nature of the State's case, and the overall strength of the State's case.

*Hale*, 277 Wis. 2d 593, ¶ 61.

¶ 47. Mark's compelled statements, the hotel incident itself, and the opinions of Dr. Anderson and Dr. Coffey were frequently referred to throughout the trial, and this evidence was a significant part of the State's case. In the prosecutor's opening statement he described the hotel incident and explained that it was the reason for Mark's revocation after he was released on parole; he also described Dr. Anderson's and Dr. Coffey's use of the actuarial instruments to decide Mark's likelihood of reoffending. Dr. Anderson described the hotel incident in detail as well as Mark's admission that he

wanted to have sex with that woman, and it was one of the reasons Dr. Anderson concluded his treatment had been inadequate. She referred to it again in explaining how she scored the actuarial incidents and used it as the "index offense"—that is, the most recent incident of sexual misbehavior resulting in official sanction. On redirect the prosecutor's questions and her answers emphasized for the jury that the hotel incident was properly used in increasing his score, and, thus, his risk: it showed "repetitive [offending] behavior" and it was one of the two events that had occurred since he was released on parole (the other being his termination from the community treatment) that explained why he was considered appropriate for a WIS. STAT. ch. 980 commitment now but had not been when the decision was made to release him on parole.

¶ 48. Dr. Coffey referred to the hotel incident as the reason she believed Mark needed more treatment and as part of a pattern of negative sexual behavior. She also explained how she used it as the index offense in her scoring of the actuarial instruments, testifying, as noted above, that the scores on both the instruments she used would have been lower by three points and acknowledging that with those scores Mark might not be a candidate for WIS. STAT. ch. 980.[20]

¶ 49. The Department of Corrections (DOC) official who testified for the State read the notice of violation for the hotel incident and Mark's written and

---

[20] At oral argument the State argued that, if one used the scoring rules in trial exhibit 36, "Coding Rules For the Static-99," Mark's score on that instrument would be the same with or without the hotel incident as the index offense. However, counsel for the State acknowledged that his analysis of the correct score, if the hotel incident was not used as the index offense, is not part of the evidence. We therefore do not consider it.

oral statements about the incident. The prosecutor's questions emphasized that Mark admitted the incident and its sexual nature, the department relied on it in revoking Mark's parole, and Mark could have challenged the revocation but did not. There was extensive questioning by both the prosecutor and defense counsel on the details of the incident as described in the written statement, as well as two questions by jurors, which the court asked the attorneys to address.

¶ 50. In closing argument the State described the hotel incident and argued that it—along with the termination from community treatment and a parole rule violation involving a woman from Mark's church—showed that the treatment Mark initially received in prison was not adequate to change his sexually violent behavior. The State also argued that Dr. Anderson's and Dr. Coffey's scoring of the actuarial instruments was correct, in particular using the hotel incident as the index offense, and that these scores should be given weight by the jurors because they were consistent with each other and consistent with his offense history and lack of treatment.

¶ 51. The State contends that, even without the erroneously admitted evidence, it is beyond a reasonable doubt that a rational jury would have arrived at the same verdict. The State points out in this context that the fact-finder at a WIS. STAT. ch. 980 trial may accept or reject an expert's opinion and accept or reject certain portions while disregarding others. *See State v. Kienitz*, 227 Wis. 2d 423, 438–39, 597 N.W.2d 712 (1999). The jury was instructed accordingly and both the State and defense told this to the jury. We add that we are aware of no case holding that a finding of future dangerousness must be supported by expert testimony. *See id.* at 439–40. However, while the jury here was free to disregard the

experts' opinions on future dangerousness, it is highly unlikely that it did so. The experts' opinions on this issue, particularly the actuarial instruments, were extensively presented and examined; and the defense focused on questioning the accuracy of predictions based on these instruments. It is therefore unlikely that the experts' opinions on Mark's future dangerousness were not an important influence on the jury's verdict.

¶ 52. However, we agree with the State that the harmless error analysis requires that we consider whether evidence other than the experts' opinions (and Mark's statements and evidence of the hotel incident itself) would have resulted in a rational jury finding that Mark is much more likely than not to reoffend. The State points to the following evidence: Mark's diagnosis of pedophilia, the history of Mark's charged and uncharged offenses, the testimony on Mark's treatment history, and the parole rule violation involving the woman from his church.

¶ 53. There was extensive evidence of Mark's offense history before he was initially incarcerated: the three 1994 convictions involving his stepson, then six, and stepdaughter, then seven; four additional incidents involving them that were charged but dismissed and read-in for sentencing; and five uncharged incidents that he admitted when those charges were brought that occurred between approximately 1982–92 and involved touching or fondling the genitals of two young boys and two developmentally disabled young men. One expert described these incidents as showing that Mark deliberately put himself in situations where he had access to very young or vulnerable individuals. There was, in addition, testimony that Mark had said about the incidents that he had an attraction to young boys and had expressed fears that he would have difficulty controlling

himself. This history was the basis for the diagnosis of pedophilia, which was not challenged by the defense.

¶ 54. However, as the State implicitly acknowledged in both its opening statement and its closing argument, the diagnosis of pedophilia based on a history of offenses occurring in 1994 or earlier, without more, was not sufficient evidence that Mark was much more likely than not to reoffend upon release in 2003. There was no suggestion from any evidence, expert or otherwise, that his conduct and attitudes prior to his initial incarceration were sufficient to predict that he would be much more likely than not to reoffend if released in 2003. Indeed, the jury was told that Mark was evaluated before his parole in 1999 and, instead of seeking commitment under WIS. STAT. ch. 980 then, the decision was made to release him on parole. Both the State and the defense focused attention on Mark's conduct after release on parole as critical to the State's case that Mark was much more likely than not to reoffend.

¶ 55. With respect to treatment, the evidence was that Mark had completed four months of sex offender treatment while incarcerated in 1995 and was seen as making sufficient progress in all areas. However, while on parole he was terminated from the community treatment program he was involved in because he was seen as being dishonest about his conduct with his stepson and inadequately motivated. When he was reincarcerated, there was not sufficient time before his release for him to participate in more extended sex offender treatment programs. The State's argument to the jury that his 1995 treatment was not successful was based in part on the hotel incident, and that was also one reason the experts concluded that his treatment had been inadequate. No one argued to the jury or testified that Mark's termination from the community treatment program while on parole was sufficient in itself to show that he was an

untreated pedophile who was much more likely than not to reoffend.

¶ 56. The evidence of the rule violation involving the woman from Mark's church occurred before the hotel incident and resulted in a warning and rule modifications. Mark talked to this woman on several occasions, watched her breast feed her baby and fold her undergarments in a way that made her uncomfortable, and admitted to fantasizing about her naked. This violated the rule of his parole that prohibited him from having a relationship with a woman without permission. The State mentioned this conduct in its opening statement and closing argument as part of Mark's conduct on parole that showed he had not been adequately treated. However, Dr. Coffey did not mention this conduct in explaining what she considered in arriving at her opinions; and Dr. Anderson testified that this conduct would not have qualified as an index offense for purposes of scoring on the actuarial instruments even if it had been the most recent. Her testimony is vague on whether she attached significance to this conduct beyond the fact of the rule violation and failure to talk about it at treatment. The conduct does not involve a criminal offense (see footnote 4) and DOC did not view it as warranting revocation.

¶ 57. In summary, while the termination from the community treatment program and the rule violation were presented as conduct that, along with the hotel incident, showed Mark was at risk to reoffend, their significance without the hotel incident is not clear. The hotel incident was the dominant focus, in argument and testimony, of the conduct Mark engaged in after release on parole that showed he was still dangerous. Given the ambiguity of the conduct underlying the rule violation

and the lack of testimony explaining how the community treatment termination related to Mark's future dangerousness, particularly in view of the treatment he earlier successfully completed, we think it is speculative whether a rational jury would have decided, without the hotel incident and the experts' opinions on dangerousness, that Mark was much more likely than not to reoffend.

¶ 58. We conclude that the State has not demonstrated beyond a reasonable doubt that the errors—the admission of Mark's two statements on the hotel incident, references to the statements and to the hotel incident, and the experts' opinions that Mark was much more likely than not to reoffend—were harmless.

## CONCLUSION

¶ 59. We conclude that Mark's written and oral statements were compelled and, because they were also testimonial and incriminating, their admission at trial violated Mark's Fifth Amendment privilege against self-incrimination, made applicable to him by WIS. STAT. § 980.05(1m). We further conclude that under Fifth Amendment case law, testimony referring to the hotel incident and the two experts' opinions that Mark was much more likely than not to reoffend should have been excluded because that evidence was derived from Mark's statements. Finally, we conclude these errors were not harmless. We therefore reverse the circuit court's order and reverse the judgment that Mark is a sexually violent person and remand for a new trial.

*By the Court.*—Judgment and order reversed and cause remanded with directions.