STATE of Wisconsin, Plaintiff-Respondent,

v.

Joseph J. SPAETH, Defendant-Appellant.

Supreme Court

*No. 2009AP2907–CR. Oral argument October 18, 2011.*
*—Decided July 13, 2012.*

2012 WI 95

(Also reported in 819 N.W.2d 769.)

For the defendant-appellant, there were briefs filed by *Shelley M. Fite* and *Andrew R. Hinkel,* assistant state public defenders, and oral argument by *Shelley M. Fite.*

For the plaintiff-respondent, the cause was argued by *Sally L. Wellman* and the brief was filed by *Mark A. Neuser,* assistant attorneys general, with whom on the brief was *J.B. Van Hollen.*

An amicus curiae brief was filed by *Jake L. Remington, Ellen Henak* and *Henak Law Office, S.C.,* Milwaukee, for the Wisconsin Association of Criminal Defense Lawyers.

¶ 1. DAVID T. PROSSER, J. This case is before the court on certification by the court of appeals, pursuant to Wis. Stat. § (Rule) 809.61 (2009–10).[1] Joseph J. Spaeth (Spaeth) appealed his convictions of four counts of child enticement after the Winnebago County Circuit Court, William H. Carver, Judge, declined to suppress an incriminating statement Spaeth made to Oshkosh police officers who were conducting a follow up investigation of incriminating admissions that Spaeth made to his probation agent during a compelled polygraph examination. Spaeth claims that his admissions to the agent were subject to use and derivative use immunity, and that the derivative use immunity covered the subsequent statement he made to Oshkosh police, even though this statement was preceded by a valid *Miranda* warning and Judge Carver found that the statement was voluntary. *See Miranda v. Arizona,* 384 U.S. 436 (1966).

---

[1] All subsequent references to the Wisconsin Statutes are to the 2009–10 version unless otherwise indicated.

¶ 2. The court of appeals certified the case to this court, asking us "to clarify if a statement made to law enforcement following a probationer's honest accounting to an agent may become a 'wholly independent source' under *Kastigar [v. United States,* 406 U.S. 441, 460 (1972)] and, if so, under what parameters."

¶ 3. We hold that the statement that Spaeth made to Oshkosh police was derived from the compelled, incriminating, testimonial statement that he made to his probation agent. Thus, Spaeth's statement to police was not derived from a source "wholly independent" from his compelled testimony, as required by *Kastigar* and *State v. Evans,* 77 Wis. 2d 225, 252 N.W.2d 664 (1977), even though the statement was preceded by a valid *Miranda* warning. Consequently, Spaeth's statement to officers is subject to derivative use immunity and may not be used in any subsequent criminal trial. Therefore, we reverse the convictions of Joseph Spaeth and determine that his compelled statement to his probation agent, his subsequent statement to Oshkosh police, and any evidence derived from either statement must be suppressed in any criminal trial. This rule does not apply to a revocation hearing.

## I. FACTUAL BACKGROUND

¶ 4. In February 2006 Spaeth was on probation[2] for first degree sexual assault of a child. His probation agent was Rebecca DeWitt (Agent DeWitt). On Febru-

---

[2] The parties assert that Spaeth was on probation. The record is not clear whether Spaeth's status was probation or parole. However, the immunity discussed in this opinion applies, in the same manner, to individuals on either probation or parole. *State v. Evans,* 77 Wis. 2d 225, 227–28 & 228 n.1, 252 N.W.2d 664 (1977).

ary 15, 2006, Spaeth came to Agent DeWitt's office to participate in a polygraph examination. All sex offenders supervised by Agent DeWitt were required to take polygraph examinations at least once per year. Spaeth was required to take this examination, required to cooperate with the examiner, and required to answer questions truthfully. His failure to take the polygraph examination could have resulted in revocation of his probation. His failure to answer questions truthfully also could have resulted in a serious sanction.

¶ 5. Before taking the polygraph examination, Spaeth signed a "consent form" provided by Behavioral Measures Midwest, L.L.C., the company administering the polygraph examination. The form read in part:

> [P]ursuant to Wisconsin Administrative Code 332.15, my Wisconsin Department of Corrections (DOC) Agent has requested I take a polygraph examination.
>
> . . . .
>
> I understand that I am not required to consent to the administration of the examination, and that I can stop the examination at anytime that I desire. In regards to any admissions I make concerning offenses for which I am not on deferred adjudication, probation, or parole, or for which I have not been previously convicted by a court of law, I understand I have the right to have a lawyer present to advise me prior to any questioning and during any questioning. If I am unable to employ a lawyer, I have the right to have a lawyer appointed to counsel with me prior to and during any questioning. I have the right to remain silent and not make any statement at all and any statement I make can and may be used in evidence against me at my trial. I have the right to terminate the interview at anytime.

¶ 6. The form given to Spaeth was not an accurate statement of the law for this probationer.[3] Spaeth's failure to take the polygraph examination could have resulted in his revocation, and his refusal to sign the "consent form" could have been deemed a refusal to take the polygraph examination. In addition, any statements that Spaeth made during the polygraph examination were subject to use and derivative use immunity and could not be used against him at a criminal trial. Agent DeWitt later testified that Spaeth was aware that the polygraph results and the statements he made in the examination could not be used in a criminal prosecution.

¶ 7. A polygraph examination in these circumstances consists of three parts. First, there is pretest preparation in which the examiner goes through the rules that apply to the probationer and the probationer has an opportunity to admit in advance to any kind of rule violation. Second, there is the actual polygraph test during which the probationer is asked point by point whether he has violated any rule. Third, there is a post-test interview based on admitted rule violations and any apparent deception during the test.

¶ 8. On the morning of February 15, Spaeth signed the form, went through the pretest preparation, and took the test. Agent DeWitt was not present while the test was administered. However, following the test, she was told by the examiner that the polygraph showed that Spaeth was being deceptive.

¶ 9. Thereafter, Agent DeWitt discussed the results of the polygraph with the examiner in Spaeth's

---

[3] The language cited above from the polygraph "consent form" should be compared to the language in a probation/parole form used in the case of *State v. Mark,* 2008 WI App 44, ¶ 5, 308 Wis. 2d 191, 747 N.W.2d 727 (hereinafter *Mark III*).

presence. During this interview, Spaeth admitted violating his curfew, having unsupervised contact with minors, and engaging in physical contact with those minors—all violations of his rules of supervision. Specifically, Spaeth "said that he had been horse-playing with his nieces and nephews and he knew that to be wrong."

¶ 10. Believing that Spaeth had violated his supervision rules, Agent DeWitt contacted the Oshkosh Police Department to pick up Spaeth for a probation hold.

¶ 11. Before Oshkosh police officer Joseph Framke (Officer Framke) arrived, Spaeth admitted more: that he "may have brushed up against his nieces and nephews vaginas or butts or breast area." This admission changed Spaeth's status from someone who was about to be held for rules violations to someone who was about to be held in connection with a possible criminal offense. When Officer Framke arrived, he was told in Spaeth's presence that Spaeth had admitted to physical contact with minors that "may have been a sexual assault." Officer Framke later acknowledged that the agent told him that Spaeth "had made some comments about possibly having inappropriate contact with some nephews and nieces" and "having some contact with the vagina, breast and buttock area."

¶ 12. Officer Framke handcuffed Spaeth and put him in the back of his squad car. He also asked Spaeth "if he would be willing to sit down and talk to me about what Agent DeWitt had told me, and he told me that he would." Agent DeWitt was present during this exchange, and she immediately told Spaeth that he did not need to speak with police and that he could speak with an attorney and that he was not compelled to give detectives "any kind of statement. And Joe [Spaeth] said, no, he wanted to get it off his chest."

¶ 13. Spaeth was taken to the police station at approximately 1:00 p.m. At the station he was led to an interview room at the Oshkosh Police Department where he met with Officer Framke and Detective James Busha (Detective Busha). Before the interrogation, Officer Framke told Detective Busha about the information he had received that Spaeth may have sexually assaulted some children. In the interview room, Detective Busha began to discuss Spaeth's *Miranda* rights at 1:20 p.m., and the officers believed that Spaeth understood those rights. Spaeth agreed to speak with the officers and did not invoke his *Miranda* rights. Spaeth was in custody continuously from the time Officer Framke placed him in custody for a probation hold until Spaeth gave the statement to officers. The waiver of rights form was signed by Spaeth at 1:24 p.m.

¶ 14. During the interrogation, Spaeth gave a statement that Detective Busha transcribed. The statement implicated Spaeth in several sexual assaults of his minor relatives, including incidents on two dates in mid-February, when Spaeth brushed up against the children inappropriately while wrestling with or tickling them. The interrogation was completed by approximately 2:40 p.m.

¶ 15. Oshkosh Police were unaware of any new sexual assaults involving Spaeth prior to Agent DeWitt informing them of Spaeth's admissions; Agent DeWitt's disclosure led to the officers obtaining the statement during the interrogation.

¶ 16. After interrogating Spaeth, Detective Busha met with the parents of Spaeth's minor relatives who were the victims of the alleged crimes. The parents confirmed that Spaeth had contact with the minor relatives but said they were not aware that Spaeth had

228

any sexual contact with them. The minor relatives were not able to say that they had been assaulted by Spaeth.

## II. PROCEDURAL HISTORY

¶ 17. A criminal complaint was filed on April 25, 2006, charging Spaeth with four counts of sexual assault of a child under 13 years of age contrary to Wis. Stat. §§ 948.02(1), 939.50(3)(b), 939.62(2m)(b)2. (2005–06). Spaeth was charged as a persistent repeater under Wis. Stat. § 939.62(2m)(b)2. (2005–06) on all four counts.

¶ 18. Before trial, the defendant moved to suppress "any and all statements obtained by the Oshkosh Police Department, Division of Probation and Parole, and/or any other law enforcement agencies in regard to this case, as well as . . . any leads derived from any such statements or evidence."

¶ 19. The circuit court held a hearing on this motion on July 5, 2006, taking evidence from Agent DeWitt, Officer Framke, and Detective Busha. The court denied the motion, holding that the statement to police was voluntary and thus admissible.

¶ 20. The court said:

> The issue does come down to this voluntariness of Mr. Spaeth in making the statement. . . . The Court is going to find that [the oral statement to the two officers and his signed written summary of the oral statement] were provided in a voluntary manner . . . .
>
> [I]t's a fair means of the Probation Department to determine whether or not people are complying with rules. And when they come across situations that are deemed to be questionable, it certainly is appropriate to refer the matter to the police . . . and allow the police . . . to conduct further inquiry.

229

¶ 21. Spaeth's motion to suppress was reconsidered immediately before trial and again denied.

¶ 22. On June 4, 2007, Spaeth was tried by a jury and found guilty on all four counts. At trial, Officer Framke and Detective Busha both testified regarding the oral statement that Spaeth gave to them on February 15 at the Oshkosh police station; the statement that Detective Busha transcribed (and Spaeth signed) also was admitted into evidence.

¶ 23. Spaeth was sentenced to the mandatory life incarceration required for each count, with the sentences to run concurrently.

¶ 24. On October 20, 2008, the circuit court filed an order vacating Spaeth's sentence because it learned that extraneous and prejudicial information was brought into the jury room—namely, knowledge that Spaeth was already a convicted sex-offender. Two days later, the court ordered a new trial.

¶ 25. On March 13, 2009, Spaeth was convicted of four counts of child enticement contrary to Wis. Stat. § 948.07(1) after he pleaded no contest to the charges contained in an amended information. Later, the circuit court imposed a sentence of 15 years imprisonment on each count—5 years being initial confinement and 10 years being extended supervision—with the sentences to run concurrently.

¶ 26. On July 20, 2009, Spaeth wrote the circuit court a letter expressing dissatisfaction with the plea process.

¶ 27. With the approval of the court of appeals, Spaeth filed a post-conviction motion to reconsider again his motion to suppress the statement he made to the two Oshkosh officers at the police station.

¶ 28. On March 10, 2010, the circuit court held a hearing on the motion for post-conviction relief. The

230

circuit court denied Spaeth's motion, determining that use of Spaeth's statement would not have violated the derivative use prohibition contained in *State v. Evans,* 77 Wis. 2d 225.

¶ 29. The court of appeals certified the appeal to this court. The court of appeals noted "the tension between" *Evans* immunity and "the needs and policies of the DOC." The certification requests that we "clarify if a statement made to law enforcement following a probationer's honest accounting to an agent may become a 'wholly independent source' under *Kastigar* and, if so, under what parameters."

## III. STANDARD OF REVIEW

¶ 30. In this case, we are reviewing the application of constitutional principles to facts. "To the extent the circuit court made findings of fact, we accept those" findings of fact unless they are clearly erroneous. *State v. Mark,* 2008 WI App 44, ¶ 15, 308 Wis. 2d 191, 747 N.W.2d 727 (hereinafter *Mark III*). We review de novo the application of constitutional principles to those facts as questions of law. *Id.; State v. Ward,* 2009 WI 60, ¶ 17, 318 Wis. 2d 301, 767 N.W.2d 236.

## IV. ANALYSIS

¶ 31. This case requires the court to reexamine the fundamental principles of the privilege against self-incrimination guaranteed by the Fifth Amendment.

¶ 32. The Fifth Amendment to the United States Constitution reads, in part: "No person . . . shall be compelled in any criminal case to be a witness against

himself." This privilege has been incorporated into the Fourteenth Amendment to apply to the States. *Malloy v. Hogan,* 378 U.S. 1, 6 (1964). Wisconsin has its own equivalent privilege in Article I, Section 8 of the Wisconsin Constitution.

¶ 33. The privilege against self-incrimination is "an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.' " *Ullmann v. United States,* 350 U.S. 422, 426 (1956) (citation omitted). The privilege "reflects many of our fundamental values," including an "unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses;" and the "realization that the privilege, while sometimes a shelter to the guilty, is often a protection to the innocent." *Murphy v. Waterfront Comm'n of N.Y. Harbor,* 378 U.S. 52, 55 (1964) (citation and internal quotation marks omitted).

¶ 34. The privilege against self-incrimination was carefully analyzed in *Kastigar v. United States,* 406 U.S. 441, in circumstances where it collided with the government's firmly established, often-critical need to compel testimony. The Court said that the Fifth Amendment privilege was the most important exemption to the government's power to compel testimony. *Kastigar,* 406 U.S. at 444. "It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Id.* at 444–45.

¶ 35. The Court noted that immunity statutes "seek a rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify." *Id.* at 446.

¶ 36. In upholding a federal immunity statute, the Court determined that when the government compels incriminating testimony, it must grant immunity that is coextensive with the privilege against self-incrimination. *Id.* at 449. "We hold that . . . immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." *Id.* at 453. Stated differently, "a grant of immunity must afford protection commensurate with that afforded by the privilege . . . . Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection." *Id.*

¶ 37. The Court hammered the significance of the derivative use protection. Immunity must prohibit "the prosecutorial authorities from using the compelled testimony in *any* respect." *Id.* "This total prohibition on use provides a comprehensive safeguard, *barring the use of compelled testimony as an 'investigatory lead,'* and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." *Id.* at 460 (emphasis added) (footnote omitted).

¶ 38. Quoting from *Murphy v. Waterfront Comm'n,* 378 U.S. at 79 n.18, the Court said:

> "Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by

establishing that they had an independent, legitimate source for the disputed evidence."

*Kastigar,* 406 U.S. at 460. "This burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is *derived from a legitimate source wholly independent of the compelled testimony." Id.* (emphasis added).

¶ 39. The principles stated in *Kastigar* were strongly affirmed in *New Jersey v. Portash,* 440 U.S. 450 (1979), where the question was whether a prosecutor could use a person's legislatively immunized grand jury testimony to impeach the person's credibility when testifying as a defendant in a criminal trial. *Id.* at 451. The answer was a resounding no.[4] In its opinion, the Court said that "a defendant's compelled statements, as opposed to statements taken in violation of *Miranda,* may not be put to any testimonial use whatever against him in a criminal trial." *Id.* at 459.

> Testimony given in response to a grant of legislative immunity is the essence of coerced testimony. In such cases there is no question whether physical or psychological pressures overrode the defendant's will; the witness is told to talk or face the government's coercive sanctions, notably, a conviction for contempt. The information given in response to a grant of immunity may well be more reliable than information beaten from a helpless defendant, but it is no less compelled.

---

[4] *Evans* had left open the possibility that immunized statements could be used for impeachment purposes, 77 Wis. 2d at 235–36, but *Evans* predated *New Jersey v. Portash,* 440 U.S. 450 (1979), and that part of *Evans* is no longer valid. *State v. Thompson,* 142 Wis. 2d 821, 831, 419 N.W.2d 564 (Ct. App. 1987).

The Fifth and Fourteenth Amendments provide a privilege against *compelled* self-incrimination, not merely against unreliable self-incrimination. Balancing of interests . . . . is not simply unnecessary. It is impermissible.

*Id.*

¶ 40. Both *Kastigar* and *Portash* involved grants of immunity that were slightly different from the immunity at play here. But the Supreme Court's decision in *Minnesota v. Murphy*, 465 U.S. 420 (1984), explicitly discussed immunity in the context of statements to a probation agent.

¶ 41. The case involved a probationer, Marshall Murphy, who admitted to a third party that he had committed a rape and murder unrelated to the offense for which he was on probation. *Id.* at 423. When this information was brought to his agent's attention, she wrote to Murphy to arrange for a meeting with him in her office and told him at the meeting of the information she had received. *Id.* She suggested that the information showed that Murphy needed continued treatment. *Id.* at 423–24. Murphy responded angrily, stated that he "felt like calling a lawyer," denied the crime he had been convicted of but admitted that he had committed the rape and murder. *Id.* at 424. The agent did not tell Murphy until after his admission that she had a duty to report his admission to police. *Id.*

¶ 42. The *Murphy* case turned on the question whether Murphy was required to *invoke* his right not to incriminate himself before making his incriminating statements.

¶ 43. The Court did not distinguish Murphy's case on grounds that he was on probation. In fact, the Court made clear that the privilege against self-incrimination is not diminished by the fact that "a defendant is

imprisoned or on probation at the time he makes incriminating statements, *if those statements are compelled." Id.* at 426 (emphasis added). Instead, the Court noted that as a general rule, a person is not protected by the privilege against self-incrimination unless the person first asserts the privilege. The Court said that

Murphy was in no better position than the ordinary witness at a trial or before a grand jury who is subpoenaed, sworn to tell the truth, and obligated to answer on the pain of contempt, unless he invokes the privilege and shows that he faces a realistic threat of self-incrimination. The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of the privilege.

*Id.* at 427. "[I]n the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself." *Id.* (quoting *Garner v. United States,* 424 U.S. 648, 654 (1976)). "[A] witness under compulsion to make disclosures must assert the privilege in a timely manner." *Murphy,* 465 U.S. at 428 (citing *United States v. Kordel,* 397 U.S. 1 (1970)).

¶ 44. Having established this general rule, the Court acknowledged exceptions, the first being "custodial interrogation." *Id.* at 429–30. The rule does not apply the same way when a person is "in custody." Under *Miranda v. Arizona,* 384 U.S. 436 (1966), incriminating statements obtained during custodial interrogation must be suppressed unless a suspect fails to claim the Fifth Amendment privilege *after* being warned of the right to remain silent and warned of the consequences of failure to assert that right. *Murphy,* 465 U.S. at 430 (emphasis added)(citing *Miranda,* 384 U.S. at 467–69, 475–77).

¶ 45. The Court was quick to explain that this exception did not apply to Murphy because he was not "in custody" when he was in his probation agent's office. The communication that the agent sent to Murphy did not order him to appear at a particular time. He came when it was convenient to both of them, *id.* at 433, and he left after he had made his incriminating admission, *id.* at 424.

¶ 46. Hence, the critical issue in that case was whether Murphy was in a situation that gave rise to a self-executing privilege against self-incrimination, that is, a privilege that he did not have to invoke.

¶ 47. The Court spelled out such an exception: "The general rule that the privilege must be claimed when self-incrimination is threatened . . . [is] inapplicable in cases where the assertion of the privilege is penalized so as to foreclose a free choice to remain silent, . . . [thus] compel[ling] incriminating testimony." *Id.* at 434 (citation and internal quotation marks omitted).

> The threat of punishment for reliance on the privilege distinguishes cases of this sort from the ordinary case in which a witness is merely required to appear and give testimony. A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty

situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

*Id.* at 435.

¶ 48. The Court concluded, with respect to Murphy, that Minnesota did *not* go beyond requiring him to appear and give testimony. It did not "require him to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." *Id.* at 436. Requiring him to make that choice, the Court said, would constitute an "extra, impermissible step." *Id.*

¶ 49. The result in *Minnesota v. Murphy* does not govern this case. The parties concede that under the law of Wisconsin embodied in statutes, rules, and case law,[5] and under the particular circumstances facing Spaeth as explained in the sworn testimony of Agent DeWitt, Spaeth's participation in all three parts of the polygraph examination was compelled, producing compelled, incriminating testimonial evidence.[6]

¶ 50. The Wisconsin Department of Corrections (DOC) has statutory authority under Wis. Stat. § 301.132 to require sex offenders to submit to lie detector tests while they are on parole, probation, or extended supervision. Wis. Stat. § 301.132(2) provides:

---

[5] *See Thompson,* 142 Wis. 2d at 828–29 (holding, post-*Murphy,* that under Wisconsin law a probationer had been compelled to speak and was thus required to receive immunity under *Kastigar* and *Evans*).

[6] The State forthrightly concedes that "It is undisputed that Spaeth's inculpatory statement to his probation agent was 'compelled' as a matter of law and protected by *Evans* immunity."

> The department may require a sex offender to submit to a lie detector test when directed to do so by the department. The department may require submission to a lie detector test under this subsection as a part of a sex offender's correctional programming or care and treatment, as a condition of a sex offender's probation, parole or extended supervision, or both as a part of a sex offender's correctional programming or care and treatment and as a condition of the sex offender's probation, parole or extended supervision.

*Id.*

¶ 51. In addition, under Wis. Stat. § 301.132(3), the DOC has rulemaking authority to "establish[] a lie detector test program for sex offenders." *Id.* Under that rulemaking authority, the DOC has promulgated Wis. Admin. Code § DOC 332.17 (June 2009), which provides in pertinent part:

> (1) SELECTION OF PARTICIPANTS. Upon the approval of an agent's supervisor, an agent may require an offender who is a sex offender to participate in the lie detector program. The agent may require an offender who is a sex offender to submit to the lie detector examination process based on the following:
>
> . . . .
>
> (b) For an offender who is a sex offender and who is currently on probation or parole:
>
> 1. The offender's criminal record of sexual offenses.
>
> 2. The offender's adjustment under supervision, including recent rules violations or recent consideration for alternatives to revocation.
>
> 3. The offender's compliance with current programming.
>
> (2) NOTICE. (a) An agent shall provide an offender

239

who is a sex offender and who is selected to participate in the lie detector examination process written notice of the lie detector program requirements. *The department may require an offender who is a sex offender to participate in the lie detector examination process without the offender's informed consent.*

(b) An agent shall provide written notice to an offender who is a sex offender and who is required to take a lie detector test. The notice shall include the following:

1. Date, time, and location of the scheduled test.

2. Instructions to complete any preliminary questionnaires.

. . . .

(4) TEST ADMINISTRATION. The department may administer lie detector tests or contract with an outside vendor to administer the tests. . . .

. . . .

(6) SANCTIONS. (a) If an offender who is a sex offender refuses to participate in any portion of the lie detector examination process or to pay a lie detector fee, the agent shall investigate the refusal as a violation of a rule or condition of supervision in accordance with ch. DOC 331.

(b) If an offender who is a sex offender discloses a violation of a rule or condition of supervision during the lie detector examination process, the agent shall investigate the disclosure as a violation of a rule or condition of supervision, in accordance with ch. DOC 331.

(c) If an offender who is a sex offender discloses criminal conduct during the lie detector examination process, the agent, with the approval of the agent's supervisor, shall refer the disclosure to law enforcement authorities.

(d) Revocation of probation or parole of an offender who is a sex offender may not be based solely on a finding of deception as disclosed by a lie detector test.

(7) DISCLOSURE OF TEST INFORMATION. The department may disclose information regarding a lie detector test or information disclosed during the lie detector test examination process of an offender who is a sex offender only to the following and *only for purposes relating to correctional programming, care and treatment of the offender:*

(a) Department employees.

(b) Department vendors.

(c) Another agency or person.

(d) *Law enforcement agencies.*

*Id.* (emphasis added).

██

¶ 52. In sum, the law unequivocally provides that incriminating testimony may be compelled but that it may be disclosed only for purposes relating to correctional programming, care, and treatment of the offender. These legitimate purposes include revocation of probation or parole.

¶ 53. Agent DeWitt testified at the suppression hearing that DOC requires all sex offenders to take polygraph examinations. She testified that she requires all the individuals she supervises to take polygraph examinations at least annually. These individuals are required to participate in the examination process, are required to truthfully answer questions, and must sign the "consent form" or face a sanction.

¶ 54. As noted, the code itself contains a provision limiting the use of statements obtained during a polygraph examination to treatment. Wis. Admin. Code

§ DOC 332.17(7). This limitation on use of the compelled statements is constitutionally required.

¶ 55. The polygraph statute was first passed in 1995, and the administrative code provisions were promulgated in 1998. Yet, Wisconsin's history in compelling attendance and compelling truthful answers from probationers to agents in the context of probation and parole supervision, has a much longer history. In *Evans*, 77 Wis. 2d 225, this court discussed the issue of compelled statements in the probation context. In *Evans*, the probationer was charged with offenses relating to delivery of illegal narcotics. *Id.* at 228. The probationer, with the advice of counsel, refused to answer subsequent questions about his activities posed by his probation agents. *Id.* at 228–29. The agents sought to revoke probation based upon his silence. *Id.* at 229. At the revocation hearing, the probationer again invoked the privilege and his probation was revoked principally due to his silence. *Id.* at 230. The court recognized the right of the state to compel answers from probationers and parolees, but only if they were granted corresponding immunity as outlined in *Kastigar. Id.* at 231–35.

¶ 56. This court and the court of appeals also have recognized, in other contexts, the right of the State to compel statements from probationers and the corresponding obligation to provide immunity coextensive with the Fifth Amendment privilege. In *State v. Thompson,* 142 Wis. 2d 821, 419 N.W.2d 564 (Ct. App. 1987), the court of appeals held that a probationer's statements to his agent, after threat of revocation for his silence, were immunized against any use in a future criminal proceeding. *Id.* at 828–32. Likewise, in *State ex rel. Tate v. Schwarz,* 2002 WI 127, 257 Wis. 2d 40, 654 N.W.2d 438, this court held that the probationer could

not be required to admit to the crime committed as part of his treatment unless he was offered immunity as described in *Evans.*

¶ 57. The court of appeals' recent decision in *State v. Peebles,* 2010 WI App 156, 330 Wis. 2d 243, 792 N.W.2d 212, demonstrates how statements made to probation agents may be "compelled by way of probation rules." *Id.,* ¶ 19. The probationer did not invoke the privilege before a grant of immunity. However, based upon the probationer's own testimony relating his subjective view of the consequences of failure to take a polygraph examination and answer truthfully, the court of appeals held that the probationer's statements were compelled and subject to immunity under *Evans* because the statements were compelled by the rules of probation. *Id.,* ¶¶ 5, 20–21.

■

¶ 58. In the present case, Agent DeWitt's own testimony revealed that Spaeth was required to take the polygraph examination or face a sanction, including possible revocation. This compulsion is authorized by statute and rule, demonstrated in the cases, and testified to by the DOC agent involved. All parties agree that this case involves compulsion. As a result, we have no difficulty determining that Spaeth was compelled, under the rules of his probation, to answer truthfully during the polygraph examination.

■

¶ 59. In short, it makes no difference on the facts of this case that Spaeth did not invoke the privilege against self-incrimination. We see this case as one involving compelled, incriminating, testimonial evidence, making it subject to the principles of *Kastigar, Portash,* and *Evans.* This case falls within one of the stated exceptions to the "invocation" rule in *Minnesota*

*v. Murphy.* As a result, Spaeth's statement to police may not be used in any criminal proceeding because the statement was not derived from a source wholly independent from the compelled testimony. It was derived from compelled testimonial evidence.

¶ 60. The State contends that the court should apply the attenuation doctrine to the *fruits* of compelled statements like Spaeth's admissions to Agent DeWitt, when the fruits are arguably subject to derivative use immunity. We disagree.

¶ 61. The court of appeals decision in *Mark* discussed the attenuation doctrine in the compelled statement/immunity context but did not permit application of the doctrine in Mark's Chapter 980 trial. *Mark III,* 308 Wis. 2d 191, ¶¶ 19–25.

¶ 62. The court of appeals decision was the third published decision involving the State's effort to commit Charles W. Mark as a sexually violent person under Chapter 980. The first was *State v. Mark,* 2005 WI App 62, 280 Wis. 2d 436, 701 N.W.2d 598 (hereinafter *Mark I*). The second was *State v. Mark,* 2006 WI 78, 292 Wis. 2d 1, 718 N.W.2d 90 (hereinafter *Mark II*). The case presented questions about the admissibility of various statements that Mark, a convicted sex offender, made to his probation agent. This court's decision in *Mark II* stressed that "in order for a statement to be properly excluded under the Fifth Amendment privilege against self-incrimination . . . it must be [1] testimonial, [2] compelled, and [3] incriminating." *Mark II,* 292 Wis. 2d 1, ¶¶ 2, 42. The case was remanded to the circuit court to determine whether the statements determined to be "incriminating" also "were compelled." *Mark I,* 280 Wis. 2d 436, ¶ 51.

¶ 63. In the third *Mark* decision, the court of appeals examined what it called "involuntary" written

and oral statements, e.g., statements satisfying the "compelled" prong of potentially inadmissible statements. The court said:

> When an individual has given an involuntary statement, a subsequent statement is also considered involuntary unless it can be "separated from the circumstances surrounding" the earlier statement by a "break in the stream of events," between the first statement to the second, "sufficient to insulate the statement from the effect of all that went before."

*Mark III,* 308 Wis. 2d 191, ¶ 20 (citations omitted). The court of appeals then cited various "factors" that might be relevant in deciding whether there was a sufficient break, *id.,* ¶ 22, including "the time that passed between the statements, and the change in the identity of the interrogators." *Id.*

■

¶ 64. The attenuation doctrine—as normally understood to include such factors as the passage of time between improper police conduct and, say, a confession—is simply inapplicable when police are following up compelled, incriminating, testimonial statements. The attenuation doctrine has application in certain other situations where the police ultimately obtain a voluntary admission. However, we see no indication that the Supreme Court has applied or hinted at applying the attenuation doctrine to compelled, incriminating, testimonial statements subject to *Kastigar-Portash-Evans* immunity. Opening this door would invite the government to compel admissions from probationers and parolees, use the information to secure their revocations in noncriminal revocation proceedings, and then wait long enough to use the information again as the basis to investigate the suspects or obtain new admissions from them. The passage of time

does not sever a clear linkage to compelled, incriminating, testimonial evidence. Such application of the attenuation doctrine would be inconsistent with the principles of *Kastigar* and *Portash* and cannot be entertained by a state court that is bound to follow the Supreme Court in interpreting the Fifth Amendment.

¶ 65. We are equally skeptical that *Montejo v. Louisiana,* 556 U.S. 778 (2009), which recognizes "the prophylactic protection" afforded to a suspect by *Miranda,* will ever be said to override the derivative immunity that attaches to compelled incriminating testimony. If this ever happens, it must come in a directive from the Supreme Court. Thus, the circuit court's finding that Spaeth made a voluntary statement to police, after a valid *Miranda* warning, is not relevant.

¶ 66. This brings us to the question posed in the certification, namely, whether "a statement made to law enforcement following a probationer's honest accounting to an agent may become a 'wholly independent source' under *Kastigar* . . . and, if so, under what parameters."

■

¶ 67. As *Minnesota v. Murphy* makes clear, not all statements made to probation agents are subject to use and derivative use immunity. The Constitution bars the use of compelled, incriminating testimonial statements and their fruits in a subsequent criminal prosecution. However, if a statement to a probation agent is not compelled, incriminating, or testimonial it is not covered by the Fifth Amendment privilege, may be shared with law enforcement, and may be used in a criminal prosecution. Probationers do not receive immunity for information "volunteered during a routine interview with a probation officer." *Thompson,* 142 Wis. 2d at 828. The Fifth Amendment was not intended to permit offenders to "game the system" by confessing all past

wrongs at any opportunity they have, thereby precluding or seriously impairing a future criminal prosecution for those wrongs.[7]

¶ 68. Consequently, the State must understand the implications of the system it operates. Wisconsin's system appears to compel truthful answers from its probationers and parolees. The failure to supply truthful information on demand can lead to revocation. Supplying truthful information also can lead to revocation.

¶ 69. This is precisely what happened to Spaeth. A revocation hearing was held at the Winnebago County Jail on April 12, 2006. *In re Spaeth,* Wis. Div. Hearings and Appeals, No. 022806–235568–A (Apr. 17, 2006). Spaeth was revoked for the entire remainder of

---

[7] The facts in *State v. Mark* are worth careful study, especially the written and oral statements that Mark made to his probation agent about trying to break into a neighbor's bathroom in his hotel. *State v. Mark,* 2005 WI App 62, ¶ 7, 280 Wis. 2d 436, 701 N.W.2d 598 (hereinafter *Mark I*); *State v. Mark,* 2006 WI 78, ¶ 6, 292 Wis. 2d 1, 718 N.W.2d 90 (hereinafter *Mark II*); *Mark III,* 308 Wis. 2d 191, ¶ 6.

The incident at the hotel occurred on March 27, 2000. The suppressed written report was prepared by the agent and signed by Mark on April 28, 2000. *Mark II,* 292 Wis. 2d 1, ¶ 6. The oral statement was obtained "approximately two weeks" later. *Id.,* ¶ 7. The written statement reads in part: "I went back to apologize to [J]. Because [J] threatened to call the police this week [a month after the incident] that is why I notified my agent & Human Services of the incident. . . . On Sunday night on 4/23/00, [J's] boyfriend . . . told me that they were thinking about getting a restraining order against me." A DOC document in the record indicates that Mark "self-reported violations."

These facts suggest that authorities in the *Mark* case might have avoided at least some of the problems from "compelled" or immunized testimony by handling things differently.

his sentence: "two years, four months and nine days." *In re Spaeth,* Wis. Div. Hearings and Appeals, No. 022806–235568–A (May 5, 2006). He was revoked because of his sexual contact with minors which "consisted of touching or brushing their buttocks, breast and vaginal areas." *In re Spaeth,* Wis. Div. Hearings and Appeals, No. 022806–235568–A (Apr. 17, 2006). His agent testified against him. *Id.*

¶ 70. The State cannot compel a probationer to provide this kind of incriminating testimonial evidence, which may be used against him in the noncriminal revocation proceeding, *Murphy,* 465 U.S. at 435 n.7; *see also State ex rel. Cramer v. Schwarz,* 2000 WI 86, ¶ 28, 236 Wis. 2d 473, 613 N.W.2d 591, and then use that information again, directly or indirectly, to prosecute *the probationer criminally.* The State must decide whether to take the "impermissible step" of forcing a probationer "to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent," *Murphy,* 465 U.S. at 436, because forcing that choice will bar future use of the incriminating evidence in a criminal prosecution.

¶ 71. If a Wisconsin probation agent obtains an incriminating admission of criminal conduct under compulsion, the agent appears to be required to advise law enforcement, so long as the agent has approval from the agent's supervisor. Wis. Admin. Code § DOC 332.17(6)(c). Disclosure should be evaluated in every situation where revocation appears to be insufficient and criminal prosecution appears desirable. Divulging compelled, incriminating testimonial evidence to police may taint an ongoing or future independent investigation.

¶ 72. The certification memorandum observes that

> if Spaeth had initiated his statement to police—by going to the station of his own volition the next day . . . the statement *would* satisfy the *Kastigar* 'wholly independent source' standard . . . . Likewise, if the police had interviewed Spaeth for an unrelated reason (without knowledge of his statements to his agent), and Spaeth had volunteered the information to them, use of the statement would not be problematic under *Kastigar.*

¶ 73. These comments, along with the suggestions of Justice Abrahamson in her *Evans* concurrence that a probation agent may wish to delay compelling statements from or even questioning a suspect and possibly delaying a revocation proceeding until after a criminal trial, *Evans,* 77 Wis. 2d at 240–41 (Abrahamson, J., concurring), are well-taken. The *Evans* case arose in the context of statements that were required of a probationer *at* a revocation hearing. *Id.* at 229–30. Therefore, the suggestion to delay a revocation proceeding has significance only insofar as it results in a delay of statements being compelled. Compelled statements may not be used in a criminal proceeding, even if the revocation proceeding occurs after the criminal proceeding.

¶ 74. The State has the burden of proof, after a compelled incriminating testimonial statement is obtained by a probation agent, of demonstrating that evidence it wishes to use in a criminal prosecution is "derived from a legitimate source wholly independent of the compelled testimony." *Kastigar,* 406 U.S. at 460.

¶ 75. We wonder how frequently the facts before us are likely to recur—that is, how often a probation

agent has no advance warning that a probationer has committed new crimes and police have no independent knowledge that these crimes have been committed. If this occurs with any frequency, the authorities should develop strategies for dealing with such contingencies.

¶ 76. We are mindful that today's decision presents law enforcement with very difficult dilemmas. Law enforcement authorities may have to choose in some instances between (1) compelling statements to support probation revocation but effectively giving up on future prosecution; and (2) not compelling statements and then never discovering serious crimes. Nevertheless, the analysis in this opinion is not new. The result here is required by *Kastigar, Evans, Murphy,* and *Peebles.*

¶ 77. We note that nothing in this opinion prevents law enforcement from investigating offenses it learns of from a legitimate independent source, not derived from a compelled statement; and nothing in this opinion prevents DOC from using a compelled, incriminating statement to revoke probation. In short, compelled, incriminating, testimonial evidence may be invaluable for one purpose but worthless, even counterproductive, for another.

¶ 78. It is not our role as a court to develop strategies for law enforcement. That responsibility belongs to the other branches of government. Our role is to assure that the strategies employed do not abridge the constitutional rights that we have been entrusted to protect.

## V. CONCLUSION

¶ 79. We hold that the statement Spaeth made to Oshkosh police was derived from the compelled, incriminating, testimonial statement that he made to his pro-

bation agent. Thus, Spaeth's statement to police was not derived from a source "wholly independent" from his compelled testimony, as required by *Kastigar* and *Evans,* even though the statement was preceded by a valid *Miranda* warning. Consequently, Spaeth's statement to officers is subject to derivative use immunity and may not be used in any subsequent criminal trial. Therefore, we reverse the convictions of Joseph Spaeth and determine that his compelled statement to his probation agent, his subsequent statement to Oshkosh police, and any evidence derived from either statement must be suppressed in any criminal trial. This rule does not apply to a revocation hearing.

*By the Court.*—The judgment of the circuit court is reversed and the cause is remanded.

¶ 80. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). I join the majority opinion. I write to address the dissent.

¶ 81. The majority presents the constitutional principles regarding compelled statements. I write separately because I am concerned that the dissent makes some strong statements of law that appear to be a break from precedent and does so without the benefit of briefs or argument.

¶ 82. The parties agreed in the present case that Spaeth's statements to his probation agent were compelled and are subject to immunity. The State asserts: "It is undisputed that Spaeth's inculpatory statement to his probation agent was 'compelled' as a matter of law and protected by *Evans* immunity."

¶ 83. This court is not bound to accept a party's concession of law, but if a court is not going to accept the concession, in keeping with our adversarial system the court should ordinarily ask the parties to brief the

251

issue.[1] In refusing to accept a concession of law the court should recognize that, as a result of the concession, counsel for either party or for both parties may not have developed the facts at the circuit court to resolve the question of law.

¶ 84. While I would prefer to write with the benefit of briefs and argument, I believe the dissent makes some legal assertions that are inconsistent with precedent.

¶ 85. The applicable standard for compulsion is found in *Minnesota v. Murphy (Murphy II)*, 465 U.S. 420 (1984). *See* majority op., ¶¶ 40–48. The *Murphy II* Court instructs that there is compulsion when the probationer is required to appear and answer truthfully *and the State, either "expressly or by implication," asserts that the probationer will be penalized if he chooses to remain silent.*[2] Compulsion exists when the probationer is required to "choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent."[3]

¶ 86. In the present case, Spaeth was required to take a lie detector test. And, according to the State, Spaeth's probation agent testified that a refusal by

---

[1] For a discussion of the importance of adversarial briefing, see *State v. Negrete*, 2012 WI 92, ¶ 80 & n.20, 343 Wis. 2d 1, 819 N.W.2d 749 (Abrahamson, C.J., dissenting).

[2] *See Minnesota v. Murphy (Murphy II)*, 465 U.S. 420, 435 (1984).

[3] *Id.* at 436.

As the State explains: "A probationer's answers to a probation agent's question are deemed 'compelled' when the agent's questions are designed to solicit incriminating responses and when the State, 'either expressly or by implication, asserts that invocation of the [Fifth Amendment] privilege would lead to revocation of probation.' " (quoting *Murphy II*, 465 U.S. at 435).

Spaeth to cooperate with the polygraph examination would have been grounds for revocation.

¶ 87. Dissatisfied with the State's concession and without the benefit of briefs or oral argument, the dissent arguably modifies the standard for compulsion and concludes that Spaeth's statements were voluntary,[4] despite also acknowledging that the factual record is insufficient to apply the standard it announces.[5]

¶ 88. The dissent appears to modify the standard by adding a new element. It asserts that "only certain types of questions have the potential to generate Fifth Amendment concerns," dissent, ¶ 117, and that those are "questions about 'pending charges or accusations of particular criminal activity,'" dissent, ¶ 138 (quoting *Murphy II,* 465 U.S. at 435).

¶ 89. In contrast, *Murphy II* talks about questions that call for answers that "would incriminate [the probationer] in a pending *or later* criminal prosecution."[6] *Murphy II* contrasts such questions with those questions that are "relevant to [the probationer's] probationary status and pose[] no realistic threat of incrimination in a separate criminal proceeding."[7]

¶ 90. There need not be a "pending charge" or an "accusation of particular criminal activity" for a question to compel an incriminating answer. For example, a probationer could be required to answer truthfully a general question such as, "Have you committed any crimes lately?" Under such a circumstance, an affirmative answer would be incriminating. *Murphy II* instructs that if the probationer is required to choose

---

[4] *See* dissent, ¶¶ 138, 143, 147.

[5] *See* dissent, ¶¶ 137, 138, 140.

[6] *Murphy II,* 465 U.S. at 435.

[7] *Id.* at 435 n.7.

between making an incriminating statement and "jeopardizing his conditional liberty by remaining silent," the incriminating statement is subject to immunity.

¶ 91. The dissent derives its new element by seizing on language in *State v. Evans,* 77 Wis. 2d 225, 252 N.W.2d 664 (1977), without acknowledging that the *Evans* language was based on the specific facts of that case, in which there was a "pending charge" and an "accusation of particular criminal activity." Just because there was a "pending charge" and an "accusation of particular criminal activity" in *Evans* does not mean that there always must be a "pending charge" or "accusation of particular criminal activity" for an answer to be "compelled" and subject to immunity.

¶ 92. The second way in which the dissent apparently modifies the standard is by requiring that the probation officer *personally* threaten a probationer with revocation. *See* dissent, ¶ 140. This requirement is not found in *Murphy II*. Rather, the *Murphy II* Court explained: "[I]f the State, *either expressly or by implication,* asserts that invocation of the privilege [to remain silent] would lead to revocation of probation, it would have created the classic penalty situation, . . . and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution."[8]

¶ 93. After refusing to accept the State's concession and setting forth a modified test, the dissent criticizes Spaeth for failing to make a record sufficient to satisfy the newly declared modified test. Neverthe-

---

[8] *Murphy II,* 465 U.S. at 435 (emphasis added).

*Murphy II* suggests that a statement may be considered compelled if the state actually would penalize the probationer for remaining silent *or* if the probationer reasonably fears that remaining silent would result in a penalty. *Id.* at 437–38.

less, the dissent asserts that Spaeth's answers "appear[ ] to have been volunteered." Dissent, ¶ 139.

¶ 94. The dissent goes too far without briefs or a complete factual record. I write separately to specifically state my concerns with the dissent's interpretation of the case law.

¶ 95. For the reasons set forth, I write separately.

¶ 96. PATIENCE DRAKE ROGGENSACK, J. (*dissenting*). I conclude that the majority opinion errs in assuming that Spaeth's February 15, 2006, statements to his probation agent were incriminating, compelled testimony, and then permitting that assumption to drive its conclusion that Spaeth's confession to Oshkosh police officers must be suppressed. As I explain fully herein, Spaeth's statements to his probation agent were not incriminating, compelled testimony and his confession to the Oshkosh police officers was voluntarily made. Therefore, I would affirm Spaeth's conviction of four counts of first-degree sexual assault of a child. Accordingly, I respectfully dissent from the majority opinion.

## I. BACKGROUND

¶ 97. On February 15, 2006, Joseph Spaeth was on probation after being convicted of fourth-degree sexual assault of a child as a result of Spaeth's 1991 sexual assault of his 11–year-old niece, when he was 24 years old. Spaeth also was convicted of first-degree sexual assault of a child in 1993 because of Spaeth's sexual assault of his six-and-one-half-year-old niece, when he was 26 years old.[1]

---

[1] Spaeth initially received probation for the sexual assaults of his two nieces, but his probation was revoked and he was incarcerated due to the sexual assault of his aunt. On February

¶ 98. Rebecca DeWitt was Spaeth's probation agent on February 15, 2006, and it was she who asked Spaeth to undergo a polygraph as part of her supervision of him. After the test, Spaeth was interviewed by DeWitt. She was questioned at trial and said:

Q And based on those communications, did you have any concern as to whether or not Mr. Spaeth had been involved in any type of inappropriate sexual activity?

A After the polygraph examination is completed, the examiner will come and talk to me . . . . So, the examiner came and talked to me in my office and then we went into the polygraph examination room to discuss the statements that Joe had made after the exam actually.

Q And was Mr. Spaeth present when you had those discussions?

A Yes, he was.

Q And at that point did Mr. Spaeth make any admissions that he had sexual contact with children in your presence?

A At that time he said that he had been horse-playing with his nieces and nephews and he knew that to be wrong.

Because she believed that "horse-playing" with children violated Spaeth's rules of probation, DeWitt contacted the Oshkosh Police Department to pick up Spaeth on a probation hold. In regard to the probation hold, she testified:

---

15, he was on parole after his release from prison. However, I use the term "probation" to indicate his status because that is the term chosen by the majority opinion. Majority op., ¶ 4 n.2.

Q So, at that point you had discussed with Mr. Spaeth and with the polygraph examiner—When you had that interview, you discussed with him, with Mr. Spaeth, that you felt he may have violated his rules, correct?

A Yes.

Q And, specifically, you felt he may have violated his rules by sexual contact with children?

A At that point, no. . . .

. . . .

Q So, at that point not sexual assault of children but at least some other violations with the children?

A Correct.

¶ 99. Before a police officer arrived and with no indication in the record of further questioning by Agent DeWitt, Spaeth continued to talk about his interactions with his young nieces and nephews. He told DeWitt that he "may have brushed up against his nieces and nephews vaginas or butts or breast area." These latter statements were more than a violation of a rule of probation; they had the potential to indicate that sexual assaults had occurred.

¶ 100. When Officer James Framke arrived from the Oshkosh Police Department to take Spaeth into custody for the probation hold, DeWitt told him the specifics that Spaeth had relayed about his interactions with his nieces and nephews. Officer Framke asked Spaeth if he would be willing to talk with him about the touching of his nieces and nephews. DeWitt told Spaeth that he did not have to talk to the officer and that he could have an attorney, but Spaeth said that he would like to talk.

257

¶ 101. Spaeth was taken to the Oshkosh Police Department where Detective James Busha joined Spaeth and Officer Framke. Spaeth was given *Miranda* warnings by the officers.[2] He signed a waiver of rights form and the interrogation began. Spaeth then gave the officers a statement, which the officers wrote out and Spaeth signed.

¶ 102. Spaeth told the officers that on February 11, 2006, while at his brother's house, he "brushed against" his niece, N.B., who was seven-and-one-half-years-old. In so doing, he said his hand touched her "vagina, buttocks and chest."[3] He said that he knew what he was doing was wrong, but he just "get[s] a 'don't care' feeling."

¶ 103. Spaeth also told the officers that on February 14, 2006, while at his brother's house, he again touched N.B. and also touched his niece, A.R.B., who was three-and-one-half-years-old, and his niece T.M.B., who was six-and-one-half-years-old. He said he touched the girls' vaginas, buttocks and chests, and that his hand would just "rest" there for 30 seconds to one minute. At the time of these assaults, Spaeth was 38 years old.

¶ 104. Spaeth was charged with four counts of first-degree sexual assault of a child. He moved to suppress his statements to Officer Framke and Detec-

---

[2] The warnings arise from *Miranda v. Arizona*, 384 U.S. 436 (1966). They inform the suspect that he or she has the right to remain silent and the right to have an attorney present. They also caution that any statements the suspect makes can be used against him or her.

[3] When officers later interviewed family members about Spaeth's conduct with their children, N.B.'s mother explained that N.B. is cognitively challenged and could not confirm or deny whether Spaeth had inappropriately touched her.

tive Busha. His motion was denied because the circuit court concluded that Spaeth's statements were voluntarily made.

¶ 105. Spaeth was convicted on all counts after a jury trial, but the circuit court set aside the verdict and ordered a new trial because the jury had considered prejudicial information. Subsequently, Spaeth again was convicted on all four counts of first-degree sexual assault of a child after he pled no contest. He was sentenced to 15 years imprisonment on each conviction, five years of incarceration, followed by ten years of supervision. The sentences were concurrent.

## II. DISCUSSION

### A. Standard of Review

¶ 106. Whether Spaeth's statements to his probation agent were incriminating and compelled testimony such that the Fifth Amendment privilege against compulsory self-incrimination became self-executing is a question of law for our independent review. *See Minnesota v. Murphy (Murphy II)*, 465 U.S. 420, 426 (1984); *State v. Evans*, 77 Wis. 2d 225, 227–28, 252 N.W.2d 664 (1977).

¶ 107. Whether Spaeth's confession to police was the result of his voluntarily waiving his Fifth Amendment privilege against self-incrimination involves the application of constitutional principles to facts found. This also presents a question of law for our independent review. *State v. Ward*, 2009 WI 601, ¶ 17, 318 Wis. 2d 301, 767 N.W.2d 236.

## B. Compelled Testimony

### 1. Fifth Amendment principles

¶ 108. In order to receive protection under the Fifth Amendment of the United States Constitution without personally raising the privilege against self-incrimination, a person's statement must be testimonial, incriminating and compelled.[4] *State v. Mark (Mark II)*, 2008 WI App 44, ¶ 10, 308 Wis. 2d 191, 747 N.W.2d 727. However, court opinions do not always discuss all three components, but will assume that one of the components has been met.

¶ 109. The case before us is an example of that because the majority opinion assumes, without analysis, that Spaeth's statements to DeWitt were compelled.[5] When an incriminating statement has been compelled, the Fifth Amendment privilege does not have to be raised by the speaker, but rather, Fifth Amendment immunity for incriminating, compelled testimony is self-executing. *Murphy II*, 465 U.S. at 426. However, not all statements that a probationer makes to his probation agent are compelled statements. *See id.* at 438.

---

[4] The Fifth Amendment provides in relevant part that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

[5] Majority op., ¶ 58. In all fairness to the majority opinion, I note that the State conceded that Spaeth's statements were compelled. However, whether the requisite compulsion has occurred is a question of law. *See State v. Evans*, 77 Wis. 2d 225, 227–28, 252 N.W.2d 664 (1977) (concluding that certain statements were compelled). Because it is our constitutional duty to declare what the law is, we are not bound to accept concessions of law. *Lloyd Frank Logging v. Healy*, 2007 WI App 249, ¶ 15 n.5, 306 Wis. 2d 385, 742 N.W.2d 337. Therefore, I do not accept the concession.

¶ 110. My discussion of incriminating, compelled testimony and whether immunity is a self-executing result of governmental questioning begins with *Kastigar v. United States*, 406 U.S. 441 (1972), where the scope of Fifth Amendment immunity was explained. In *Kastigar*, Kastigar and other petitioners were subpoenaed to appear before a grand jury. Because the government believed that the petitioners might invoke their Fifth Amendment right to silence, a government officer obtained a court order directing the petitioners to give answers to certain questions and produce certain documents before a grand jury, which order included a grant of immunity pursuant to 18 U.S.C. §§ 6002–03. *Id.* at 442.

¶ 111. The petitioners argued that the scope of 18 U.S.C. §§ 6002–03 was not coextensive with the privilege afforded by the Fifth Amendment; therefore, protection under §§ 6002 and 6003 was not sufficient immunity to compel their testimony. *Id.* Accordingly, they refused to answer the questions asked and were taken into custody. The Supreme Court granted certiorari to determine whether testimony may be compelled by granting "use immunity," as the statute did, or whether it was necessary to grant "transactional immunity" before testimony could be compelled.[6] *Id.* at 443.

¶ 112. The Fifth Amendment privilege against compulsory self-incrimination "protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Id.* at 444–45. The

---

[6] "Use immunity" includes immunity for the use and derivative use of compelled testimony that is incriminating. *Kastigar v. United States,* 406 U.S. 441, 453 (1972). "Transactional immunity" is absolute immunity from prosecution for the crime to which the compelled, incriminating testimony relates. *Id.*

Supreme Court concluded that the "statute's explicit proscription of the use in any criminal case of 'testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information)' is consonant with Fifth Amendment standards." *Id.* at 453. The Court also explained that "[w]hile a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader" than the Fifth Amendment privilege. *Id.* The Court then concluded that transactional immunity was not required by the Fifth Amendment privilege. *Id.*

¶ 113. *Kastigar* did not delineate the circumstances that would cause testimony to be compelled. It assumed that the court order directing answers to certain questions before the grand jury was sufficient to show a governmental attempt to compel testimony.

¶ 114. *Evans*, decided in 1977 after *Kastigar*, was the first Wisconsin appellate case to undertake a thorough discussion of the method by which testimony is compelled. *Evans* set out the steps necessary to decide whether an incriminating statement had been compelled by government action.

¶ 115. Evans was a probationer who, during the course of his probation, was charged in a criminal complaint with conspiracy to deliver controlled substances. *Evans*, 77 Wis. 2d at 228. When the charges came to the attention of Evans' probation agent, he asked Evans to give an accounting of his activities on certain dates relevant to the charged conspiracy. Evans refused to answer, on the advice of counsel. *Id.* at 228–29. The probation agent sought revocation based on Evans' refusal. At his probation revocation hearing, Evans again refused to answer those questions. His

262

probation was revoked, and he was then returned to court for sentencing on the conviction that preceded his probation. *Id.* at 229–30.

¶ 116. In approving the revocation of probation for asserting his Fifth Amendment right to silence, we explained that "[t]he liberty enjoyed by a probationer is, under any view, a conditional liberty. . . . His position is not that of the non-convicted citizen." *Id.* at 230. We went on to explain that "the situation in which the probationer fears self-incrimination in a criminal proceeding entails another consideration, that, 'no person . . . shall be compelled in any criminal case to be a witness against himself." *Id.* at 232. Therefore, even though Evans had a constitutional right to remain silent, his status as a probationer permitted revocation of probation for exercising his silence.[7]

¶ 117. We described two steps that must be taken before a probation agent's question will impact the Fifth Amendment right to silence. First, only certain types of questions have the potential to generate Fifth Amendment concerns when answers to those questions are compelled. We said:

> [S]tatements made by a probationer to his probation agent or in a probation revocation hearing in response to *questions which*, as here, *are the result of pending charges or accusations of particular criminal activity*, may not be used to incriminate the probationer in a subsequent criminal proceeding.

*Id.* at 227–28 (footnote omitted) (emphasis added). Questions asked must be those whose answers would incriminate the probationer in the commission of a

---

[7] It is also likely that Evans would have been subject to revocation proceedings if the answers he gave incriminated him in the commission of a crime.

crime. Therefore, not every question that a probation agent asks a probationer compels an incriminating answer. Stated otherwise, it is the question itself that drives the Fifth Amendment inquiry, not the answer that is given, or refused to be given, by the probationer.

¶ 118. For example, an agent may question a probationer who is subject to a curfew about the time he returned home. A probationer is required to answer his agent truthfully, and the answer could subject the probationer to a revocation hearing. However, because the question does not relate to "pending charges" or an "accusation[] of particular criminal activity," it does not satisfy the first necessary step of *Evans*. That is, it is not a question whose answer would incriminate the probationer in a crime. As we said, "Probation conditions may proscribe activity which is not in itself violative of the criminal law." *Id.* at 234.

¶ 119. Or, a probationer who is asked a question about whether he is adhering to curfew may answer the question asked and then continue talking about matters for which no questions had been asked. If he does so and implicates himself in a crime, he will have volunteered incriminating information. However, because the probation agent did not ask a question about a pending charge or particular criminal activity, the probationer's incriminating statement would not have been compelled by the probation agent's question.

¶ 120. *Evans* also explained that a probationer could be subject to revocation proceedings both for failing to answer an agent's question about conduct that is not violative of criminal law and for refusing to answer questions concerning criminal activity. *Id.* at 234–35. We explained, "[I]t would be an absurd result to say: 'You may be revoked and sent to prison for refusal to answer questions concerning noncriminal but proscribed activ-

ity, but you may not be revoked for refusal to answer questions about possible criminal activity.' " *Id.*

¶ 121. The second step in *Evans* requires us to examine whether a question, the answer to which would incriminate the probationer, compelled the answer given. Threatened penalties, civil or criminal, for refusing to answer will suffice to cause impermissible compulsion. We explained that "the fifth amendment cannot be vitiated by imposing non-criminal penalties as a price of its exercise." *Id.* at 232. It is impermissible to threaten to impose a sanction that makes the exercise of the "Fifth Amendment privilege 'costly.' " *Id.* at 233 (citing *Spevack v. Klein*, 385 U.S. 511, 515 (1967)).

¶ 122. In *Murphy II*, decided in 1984 after *Evans*, the United States Supreme Court addressed the criteria that must be met before a court could conclude that questioning by a probation agent would cause a violation of the probationer's Fifth Amendment privilege against self-incrimination.

¶ 123. Murphy was a probationer who was required to "be truthful with the probation [agent] 'in all matters.' " *Murphy II*, 465 U.S. at 422. As a condition of probation, Murphy attended a sex offenders treatment program. *Id.* Murphy's agent learned that he had discontinued the program and required him to report to her office. *Id.* at 422–23. Murphy admitted he was no longer attending the program; however, the agent did not commence revocation proceedings because Murphy was doing well in other areas. *Id.* at 423.

¶ 124. Subsequently, the probation agent learned that Murphy told a counselor that he had committed a rape and murder in 1974. She contacted Murphy and asked him to come in and discuss a treatment plan for the remainder of his probation. *Id.* When Murphy

265

arrived for the meeting, the probation agent did not ask Murphy questions about the 1974 crimes; rather, she told Murphy about the information she had been given in regard to the 1974 rape and murder. *Id.* at 423–24. Murphy became angry at what he said was a breach of his confidences to the counselor, and in his anger, he admitted the 1974 crimes. *Id.* at 424.

¶ 125. The agent explained to Murphy that her primary concern was the relationship between the crime for which he was on probation and the 1974 criminal conduct. *Id.* She encouraged Murphy to turn himself in, but he refused. *Id.* She then secured an arrest and detention order, and a state grand jury returned an indictment charging Murphy with first-degree murder. *Id.* at 424–25.

¶ 126. Murphy sought to suppress his statements to the probation agent on the grounds that they were obtained in violation of his Fifth and Fourteenth Amendment rights. *Id.* The trial court found that Murphy was not in custody at the time the statements were made and the statements were not compelled. *Id.* The Minnesota Supreme Court reversed, holding the statements were compelled " '[b]ecause of the compulsory nature of the meeting, because [Murphy] was under court order to respond truthfully to his agent's questions, and because the agent had substantial reason to believe that [Murphy's] answers were likely to be incriminating.' " *Id.* (quoting *Minnesota v. Murphy (Murphy I)*, 324 N.W.2d 340, 344 (Minn. 1982)). The Minnesota Supreme Court also reasoned that the agent should have warned Murphy that he had a privilege against self-incrimination. *Id.*

¶ 127. In *Murphy II*, the United States Supreme Court addressed "whether a statement made by a probationer to his probation officer without prior warnings

is admissible in a subsequent criminal proceeding." *Id.* In reversing the Minnesota Supreme Court, the United States Supreme Court focused on whether Murphy's statements were compelled. Underlying the opinion is the Supreme Court's conclusion that not every statement made by a probationer to his probation agent is protected by the Fifth Amendment privilege against self-incrimination. The Supreme Court articulated this in several ways.

¶ 128. First, the Supreme Court explained that "the general obligation to appear and answer questions truthfully did not in itself convert Murphy's otherwise voluntary statements into compelled ones."[8] *Id.* at 427. The Court said that although the agent could compel

---

[8] The concurrence asserts, "Compulsion exists when the probationer is required to 'choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent.' " Concurrence, ¶ 85 (quoting *Minnesota v. Murphy (Murphy II),* 465 U.S. 420, 436 (1984)). In so stating, the concurrence leaves out the United States Supreme Court's complete statement of the premise that the Court was explaining. For completeness, the reader should note that the Court went on to state, immediately following the language quoted in the concurrence, "Because we conclude that Minnesota did not attempt to take the extra, impermissible step, we hold that Murphy's Fifth Amendment privilege was not self-executing." *Murphy II,* 465 U.S. at 436.

By so explaining, the United States Supreme Court emphasized that it took something more than being required to appear and give truthful answers to a probation agent's questions before a probationer's answers were compelled testimony. *Id.* at 436–38. In the case now before this court, all that Spaeth was required to do was to appear and to answer truthfully. The probation agent took no extra, impermissible step, which is required by *Murphy II* before Spaeth's statement could constitute compelled testimony.

267

Murphy's attendance and the giving of truthful answers, that circumstance is no different than the expectations of a witness before a grand jury, who is subpoenaed to appear and sworn to tell the truth. *Id.* at 431.

¶ 129. Second, the Court noted that Murphy was not in custody when he made his incriminating admissions; therefore, no *Miranda* warnings were required before he spoke with his probation agent. *Id.* The Court said this lack of a warning was no different from a grand jury witness where there is no requirement to warn the witness of the Fifth Amendment right to remain silent. *See id.*

¶ 130. Third, the Court explained that generally if a witness, who is not in custody but is in circumstances where he is expected to answer questions, does so instead of claiming the Fifth Amendment privilege, the government has not "compelled" him to incriminate himself. *Id.* at 432.

¶ 131. The Court explained that an interview with a probation agent was significantly different from a custodial interview. The Court said that when a person is in custody, he faces "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 430 (citing *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). Accordingly, when a person is in custody at the time of questioning, he must be provided with certain warnings to protect his Fifth Amendment right to silence. *Id.*

¶ 132. The Court concluded that an interview with a probation agent was not similar to an in-custody interview with law enforcement because one is placed in custody by arrest and is not free to leave. However, interviews with a probation agent are arranged by appointment and the person is free to leave. Therefore,

an interview with a probation agent requires a proba-
tioner to assert his Fifth Amendment privilege. *Id.* at
433. Accordingly, the Fifth Amendment does not pro-
vide a self-executing privilege for all probation inter-
views. *Id.* at 434.

¶ 133. The Supreme Court also recognized that
the general rule for non-custodial probation interroga-
tion is "inapplicable in cases where the assertion of the
privilege is penalized so as to 'foreclos[e] a free choice to
remain silent, and . . . compe[l] . . . incriminating testi-
mony.' " *Id.* (quoting *Garner v. United States*, 424 U.S.
648, 661 (1976)).[9] The Supreme Court classified such
cases as "penalty" cases because there was a penalty
threatened for the exercise of the Fifth Amendment
right. The Court pointed out that in each "penalty" case,
"the State not only compelled an individual to appear
and testify, but also sought to induce him to forgo the
Fifth Amendment privilege by threatening to impose
economic or other sanctions 'capable of forcing the
self-incrimination which the Amendment forbids.' " *Id.*
(citing *Lefkowitz v. Cunningham*, 431 U.S. 801, 806
(1977)).

¶ 134. The Court explained that each penalty case
also contained a threat of punishment for reliance on
the privilege against self-incrimination. *Id.* at 435.
Accordingly, it is permissible for a state to require a
probationer to appear and truthfully discuss circum-
stances that affect his probationary status. In such a
probation interview, without more, the Fifth Amend-
ment privilege is not self-executing. *Id.* However, the

---

[9] Murphy had argued that revocation of his probation was
threatened if he was not truthful upon questioning by his
probation agent. *Murphy II,* 465 U.S. at 434. The Supreme
Court held this argument insufficient to prove compulsion. *Id.*
at 437–38.

Court also explained that the nature of the questions could warrant a different analysis.

> The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution.

*Id.* The Court concluded that with questions that sought answers that would incriminate the probationer, the state *also* must require the probationer "to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent" before there is compulsion under the Fifth Amendment. *Id.* at 436. The United States Supreme Court concluded that Minnesota did not "take the extra, impermissible step"; therefore, Murphy's statements were not compelled by state action. *Id.*

### 2. In regard to Spaeth

¶ 135. *Murphy II* and *Evans* provide the foundation for the analysis a court must undertake in regard to whether a probationer's statement to his probation agent was compelled. *Murphy II* establishes that in order for testimony to be compelled under Fifth Amendment jurisprudence, a person either must be in custody when questioned or he must be threatened with a penalty if he refuses to answer questions that would incriminate him in a crime. *Id.* at 430–31.

¶ 136. During Spaeth's interviews with DeWitt, he was not in custody. DeWitt testified that Spaeth was asked to come in to take a polygraph examination, and he agreed to do so. Spaeth was free to leave the probation interview.

¶ 137. After the examination was concluded, De-Witt talked with Spaeth because the test results showed

that he may have been deceptive in some of his answers. The record does not contain the question that DeWitt asked prior to Spaeth's telling her that he had been "horse-playing" with his young nieces and nephews and that he knew that was "wrong."

¶ 138. Therefore, we don't know if DeWitt's question had the potential to elicit incriminating statements under the standards explained in *Evans*. However, it is very unlikely that it was a qualifying question because there is nothing in the record to imply that the question she asked related to "pending charges or accusations of particular criminal activity," as *Murphy II* and *Evans* require. *Murphy II*, 465 U.S. at 435; *Evans*, 77 Wis. 2d at 227–28; *see also State v. Mark (Mark I)*, 2006 WI 78, ¶ 33 n.12, 292 Wis. 2d 1, 718 N.W.2d 90 (affirming *Evans'* delineation of the type of questions that have the potential to elicit incriminating testimony).[10]

¶ 139. Furthermore, Spaeth's later description of his interactions with his nieces and nephews as to his hands touching their breasts, butts and vaginas appears to have been volunteered without any additional question from DeWitt. Although the record is silent in regard to any of DeWitt's questions, we do know that

[10] In *State v. Mark (Mark I)*, 2006 WI 78, 292 Wis. 2d 1, 718 N.W.2d 90, we remanded to the circuit court to determine whether Mark's statements were compelled, and we noted that the nature of the questions asked was an issue in making this determination. *Id.*, ¶ 33 n.12. When the court of appeals reviewed the subsequent circuit court decision, it did not address the type of question that was asked. It considered only the answers given by Mark. *See State v. Mark (Mark II)*, 2008 WI App 44, ¶¶ 16–25, 308 Wis. 2d 191, 747 N.W.2d 727. This led the court of appeals to an incorrect analysis because it is the question that compels an incriminating answer. It is not the incriminating answer that determines whether the question was compelling.

DeWitt called the Oshkosh Police Department to come to pick up Spaeth before he described what turned out to be criminal conduct.

¶ 140. Furthermore, even if I were to assume, *arguendo*, that DeWitt asked Spaeth questions that had the potential to incriminate him in a pending charge or were related to specific criminal activity, there is nothing in the record to suggest that DeWitt threatened Spaeth with revocation if he refused to answer. As the United States Supreme Court has stated, "the general obligation to appear and answer questions truthfully d[oes] not in itself convert . . . otherwise voluntary statements into compelled ones." *Murphy II*, 465 U.S. at 427; *see also Mark I*, 292 Wis. 2d 1, ¶ 25 (concluding that "the mere fact that an individual is required to appear and report truthfully to his or her probation (or parole) officer is insufficient to establish compulsion"). Therefore, because the State did not take the impermissible step of requiring Spaeth to choose between revocation and answering DeWitt's questions, his answers were not compelled. *Murphy II*, 465 U.S. at 433; *see also State v. Thompson*, 142 Wis. 2d 821, 829, 419 N.W.2d 564 (Ct. App. 1987) (concluding that Thompson's statements were compelled because the State required him to choose between his conditional liberty and his Fifth Amendment right to remain silent).

¶ 141. It is also important to note that nothing in the record demonstrates that Spaeth was granted use immunity by statute or court order if he answered the questions asked on the polygraph test or answered the questions asked by DeWitt. "The power to grant immunity is a legislative power[;] not an inherent power of either the prosecutor or the court." *Grant v. State*, 83 Wis. 2d 77, 89, 264 N.W.2d 587 (1978) (citing *Elam v. State*, 50 Wis. 2d 383, 392–93, 184 N.W.2d 176 (1971)).

Therefore, it is critical that the requirements for concluding that a question to the probationer was of a type that would elicit incriminating testimony and that the facts necessary to show compulsion are present. If a complete analysis on compelled statements is not undertaken, courts may fall into the analysis employed by the Minnesota Supreme Court, whose erroneous analysis caused the United States Supreme Court to reverse the Minnesota court's decision.

¶ 142. As a reminder to the reader, the Supreme Court quoted the erroneous Fifth Amendment analysis of the Minnesota Supreme Court:

> [N]otwithstanding the lack of custody in the usual sense, Murphy's failure to claim the privilege when he was questioned was not fatal to his claim "[b]ecause of the compulsory nature of the meeting, because [Murphy] was under court order to respond truthfully to his agent's questions, and because the agent had substantial reason to believe that [Murphy's] answers were likely to be incriminating." In the [Minnesota] court's view, "the agent should have warned [Murphy] of his privilege against compelled self-incrimination before she questioned him and . . . her failure to do so, when she had already decided to report his answers to police, bars use of [Murphy's] confession at this trial."

*Murphy II*, 465 U.S. at 425 (citation omitted) (quoting *Murphy I*, 324 N.W.2d at 344).

¶ 143. Perhaps because the issue of compulsion to answer a question that would elicit an incriminating statement was conceded by the State, the majority opinion inadvertently expands the scope of the Fifth Amendment privilege set out in *Kastigar* and *Murphy II*. It does so when it erroneously employs *Evans* by stating, "The [*Evans*] court recognized the right of the state to compel answers from probationers and parolees, but

only if they were granted corresponding immunity as outlined in *Kastigar*."[11] The *Evans* holding is much more limited. It permitted use immunity for compelled answers only to certain kinds of questions:

> [W]e hold that upon timely objection in criminal proceedings, the testimony of a probationer or a parolee given in response to questions by a probation or parole agent or at a probation or parole revocation hearing, *which questions are prompted by pending charges or accusations of particular criminal activity*, or any evidence derived from such testimony, is inadmissible against the probationer or parolee during subsequent proceedings on related criminal charges.

*Evans*, 77 Wis. 2d at 235 (emphasis added). Therefore, without knowledge of whether the questions that DeWitt asked Spaeth were "prompted by pending charges or accusations of particular criminal activity" there is no immunity for Spaeth's answers pursuant to *Kastigar* or *Murphy II*. Accordingly, Spaeth's statements to DeWitt were not compelled.

### C. Spaeth's Statement to Oshkosh Police

¶ 144. At the hearing on Spaeth's motion to suppress his confession, the circuit court found that Spaeth's confession to law enforcement officers at the Oshkosh Police Department was voluntary. Therefore, his confession was not suppressed.[12]

¶ 145. At the suppression hearing, the argument of Spaeth's counsel focused on whether there was a sufficient break between the polygraph examination

---

[11] Majority op., ¶ 55.

[12] With new counsel, Spaeth moved for reconsideration. The circuit court denied that motion as well.

and Spaeth's subsequent confession to Oshkosh police officers.[13] The argument that his confession to the officers should be suppressed because it was the fruit of incriminating, compelled testimony to DeWitt was not raised for the circuit court's consideration. Therefore, no inquiry was made of DeWitt in regard to the questions she asked Spaeth or whether all of Spaeth's statements to her were in response to her questions, rather than voluntary statements.

¶ 146. I note that although the State has the burden of proof during a suppression hearing, the defendant has the burden of production to establish initial facts showing that his rights have been violated. *State v. Jackson*, 229 Wis. 2d 328, 336, 600 N.W.2d 39 (Ct. App. 1999). Answers to a probation agent's questions that would incriminate the probationer are compelled if the State attaches an "impermissible penalty to the exercise of the privilege against self-incrimination." *Murphy II*, 465 U.S. at 437. To attach an "impermissible penalty," a defendant must be informed "during the crucial meeting with his probation officer that an assertion of the privilege would result" in the revocation of probation. *Id.* at 438.

¶ 147. Spaeth made no record from which a court could conclude that his statements to DeWitt were anything other than voluntary statements. Therefore, the confession to law enforcement should not be analyzed as the fruit of incriminating, compelled testimony. Rather, Spaeth's statements to law enforcement should be examined under the usual cannons applicable to in-custody interrogations. Statements to law enforce-

---

[13] Counsel argued, "There wasn't any significant timeframe between the time he made the statements to the polygraph examiner and the statements to law enforcement, so we're seeking to suppress any of those statements made that day."

ment are voluntary "if they were 'the product of a free and unconstrained will, reflecting deliberateness of choice.' " *Ward*, 318 Wis. 2d 301, ¶ 18 (quoting *State v. Davis*, 2008 WI 71, ¶ 36, 310 Wis. 2d 583, 751 N.W.2d 332).

¶ 148. In regard to Spaeth's interrogation, DeWitt reminded him that he did not have to talk with the officer, before he left with the officer. When they arrived at the station house, Detective Busha said that he had been told that Spaeth had a matter that he wanted to talk about and Spaeth said he did. Detective Busha asked Spaeth if he could understand and read the English language, and Spaeth said that he could.

¶ 149. At 1:20 p.m., Spaeth was given the *Miranda* warnings form and he read out loud the *Miranda* warnings set out on the form. Detective Busha asked Spaeth if he understood what he had read. Spaeth said that he did, and at 1:24 p.m., he signed the form that he had read. The interrogation then began.

¶ 150. Detective Busha testified that he did not imply to Spaeth that his probation status would be affected by whether he cooperated in the interview. He also said that even though he knew of the polygraph examination earlier that day, he did not mention it to Spaeth. Detective Busha said that Spaeth appeared to understand his constitutional rights and that he did not appear to be under the influence of any drugs or alcohol.

¶ 151. Spaeth gave a statement about his conduct with his young nieces and nephews. An officer wrote up the statement and Spaeth signed it at 2:40 p.m. Therefore, the interview was not overly long.

¶ 152. I conclude that the totality of the circumstances supports the circuit court's conclusion that Spaeth's confession was voluntarily made. Spaeth was

38 years old. He could read and write English and had experience with law enforcement due to his two prior convictions. He said that he had something that he "wanted to get . . . off his chest." The officers were courteous, offering Spaeth's breaks and coffee. The interview lasted only one hour and 20 minutes. There is nothing to indicate that his statements to law enforcement were coerced in any way. Accordingly, the circuit court correctly denied Spaeth's motion to suppress his confession.

## III. CONCLUSION

¶ 153. I conclude that the majority opinion errs in assuming that Spaeth's February 15, 2006, statements to his probation agent were incriminating, compelled testimony and then permitting that assumption to drive its conclusion that Spaeth's confession to Oshkosh police officers must be suppressed. As I explained fully herein, Spaeth's statements to his probation agent were not incriminating, compelled testimony and his confession to the Oshkosh police officers was voluntarily made. Therefore, I would affirm Spaeth's conviction of four counts of first-degree sexual assault of a child. Accordingly, I respectfully dissent from the majority opinion.